Virginia Vega RODRIGUEZ, Plaintiff,

v.

LOCTITE PUERTO RICO,
INC., Defendant.

Civil No. 96–1815 (JP).

United States District Court,
D. Puerto Rico.

June 25, 1997.

Juan M. Surillo–Pumarada, Surillo–Pumarada & Dahdah Ramírez, Mayaguez, PR, Víctor P. Miranda–Corrada, Hato Rey, PR, for Plaintiff.

Graciela J. Belaval–Bruno, Martínez, Odell & Calabria, Hato Rey, PR, for Defendant.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it the defendant's Motion Requesting Summary Judgment (**docket No. 24**).[1] The plaintiff has brought this action under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ("ADA" or "Act"),[2] alleging that she was subjected to a hostile work environment and eventually forced to resign due to the harassment she was subjected to (primarily by her supervisor, Ms. Izaida Rivera), based on her disability, Systematic Lupus Erythematosus. The defendant now asserts that the plaintiff has failed to establish (1) that she is disabled for purposes of the ADA, (2) that she was terminated, or (3) that she was subjected to a hostile work environment because of her alleged disability.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides:

> "[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Generally, in addressing a motion for summary judgment, the Court tracks the following course. First, the court must identify material factual disputes[3], drawing all reasonable inferences

---

1. The defendant moved for summary judgment on April 3, 1997; on April 14, the plaintiff asked for thirty additional days to respond. On May 12, the plaintiff asked for another thirty days to respond. The Court granted the plaintiff until June 10 to file an opposition, stating clearly that if the plaintiff failed to do so, the Court would address the motion for summary judgment without benefit of the plaintiff's arguments. Notwithstanding the Court's Order, on June 10, the plaintiff asked for another forty-eight hour extensions. The plaintiff finally filed an opposition on June 12, after 5:00 p.m. Moreover, the defendant appended to the opposition exhibits in the Spanish language in violation of Rule 108(1) of the Local Rules of the United States District Court for the District of Puerto Rico, asking for an additional 45 days to file the exhibits in English (**docket No. 32**). The Court will consider the plaintiff's response to the extent it has been filed in compliance with the local rules, but the request for an extension for translations is hereby **DENIED**. The Court also notes that the defendant filed with its motion various documents in the Spanish language. The Court will not consider these documents either.

2. The plaintiff has asked the Court to hear a supplemental claim under Commonwealth law alleging that the defendant failed to liquidate and pay the plaintiff her accrued sick leave in the approximate amount of $1,075.24. The merits of the plaintiff's state law claim are not the subject of the defendant's motion, but the defendant asks the Court to dismiss it (a) because it would confuse the jury or (b) if the Court grants the defendant's motion for summary judgment, as an improvident exercise of supplemental jurisdiction. The Court will address the issue after dealing with the merits of the plaintiff's ADA claim.

3. The materiality of a dispute is determined by reference to the substantive law—"only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2509–10. A dispute is genuine "if the evidence is such that

in favor of the party against whom summary judgment is sought. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804 (1st Cir.1987); *but see Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (a court need not credit "conclusory allegations, improbable inferences, and unsupported speculation"). To accomplish this where the issue would be for the jury at trial and is one for which the movant would bear the burden of proof, the movant must show that, given the undisputed facts, no reasonable jury could find that the movant had failed to establish all required elements of that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the issue would be for the jury at trial but, as here, is one for which the non-moving party would bear the burden of proof, the movant must show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.* at 325, 106 S.Ct. at 2554. In other words, when the moving party does not bear the burden of proof, it must establish that no reasonable jury could find that the non-movant has established the requisite elements of its claim. If the moving party has not met its respective summary judgment burden, the motion should be denied.

Finally, where the moving party has met its initial burden of proof, the burden shifts to the non-moving party to show that some triable issue, whether factual or legal, remains unresolved. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553 (1986). If it succeeds, the motion must be denied; if it does not, the motion will be granted.

When faced with a motion for summary judgment, a district court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed.R.Civ.P. 56(c). "In addition, a court may take into account any material that would be admissible or usable at trial … [but] inadmissible evidence may not be considered." *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993). Moreover, "mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *Id.* (citing *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992)).

## III.  UNDISPUTED FACTS

Undisputed facts, along with the source from which the Court has taken them, will be cited where relevant.

## IV.  ANALYSIS

■  The ADA was enacted to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with "disabilities." 42 U.S.C.A. § 12101(b)(1). The Act forbids employers from discriminating against or refusing to make a reasonable accommodation for "a qualified individual with a disability." 42 U.S.C.A. § 12112(a). "To obtain relief under the ADA, the plaintiff must prove (1) that she was disabled within the meaning of the Act; (2) that with or without reasonable accommodation she was able to perform the essential functions of her job; and (3) that the employer [discriminated against her] [4] in whole or in part because of her disability." *Katz v. City Metal Co., Inc.,* 87 F.3d 26, 30 (1st Cir.1996). These are all issues for the jury at trial. *Id.* In this case, the plaintiff alleges that she suffered from Lupus Systematic Erythematosus and that, as a result of that condition, she is disabled for the purposes of the ADA; that she was capable of performing her job, with or without reasonable accommodations; and that she was subjected to a hostile work environment and constructively discharged due to her disability. The defendant admits that the plaintiff was capable of performing the essential duties of her job, but denies both that the plaintiff was disabled and that she was either

---

a reasonable jury could return a verdict for the non-moving party." *Id.*

4.  Discrimination under the Act may take the form, inter alia, of making employment decisions adverse to the plaintiff, *see McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 371 (6th Cir.1997), actually or constructively discharging the plaintiff, *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876 (6th Cir.1996), or subjecting the plaintiff to a hostile work environment, *Miranda v. Wisconsin Power,* 91 F.3d 1011 (7th Cir.1996).

subjected to a hostile work environment or constructively discharged.

## A. DISABILITY UNDER THE ADA

A disability is "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "physical impairment" is "any physiological disorder, or condition ... or anatomical loss affecting" a "body system" such as the musculoskeletal system or the skin. 29 C.F.R. § 1630.2(h). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(i) Substantially limited means:

(i) unable to perform a major life activity that the average person in the general population can perform; or

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In determining whether the plaintiff is disabled for the purposes of the ADA, the Court should consider:

(i) the nature and severity of the impairment;

(ii) the duration or expected duration of the impairment; and

(iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). The regulations provide a more detailed definition of a substantial limitation on the major life activity of working:

(i) The term substantially limits [sic] means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

■ The defendant argues that the plaintiff has produced no evidence from which a reasonable jury could determine that she is protected by the ADA. According to the defendant, the evidence can not establish either that the plaintiff suffered from Lupus or that any of her major life activities were impaired. The defendant's first assertion—that no reasonable jury could find that the plaintiff suffered from Lupus—is flawed, because the plaintiff need not actually suffer from an impairment to be disabled for the purposes of the ADA.[5] One is disabled under the act if she "is regarded as having" an impairment that substantially limits one or more of the major life activities. 42 U.S.C.A. § 12102(2)(C). The evidence would clearly allow a jury to determine that other employees of Loctite regarded the plaintiff has having an impairment. See Plf.'s Exh. 16 p. 8. In his deposition, James Polifka stated "I knew she had Lupus." In her deposition, Lucy Maldonado responded in the affirmative when asked "regardless of whether she did indeed suffer from or not suffer from was it your understanding that [the plaintiff] suffered from Lupus?" Plf.'s Exh. 17 p. 15. The Court takes judicial notice of the fact

---

**5.** In her response, the plaintiff focuses on Loctite's perception that the plaintiff suffered from Lupus. In particular, the plaintiff asserts an estoppel-like argument:

"we submit that Loctite may not at this stage dispute whether Ms. Vega suffers from Lupus ... [n]ot only did Loctite stipulate that fact, it accepted it during most, if not all, of Ms. Vega's employment history with it. Moreover, given the prohibition on medical examinations and inquiries [in the ADA], we submit that the employer should not be allowed to use in its defense the results of a medical examination that is proscribed by statute, that the plaintiff

refused to take and that was only allowed to go forward due to the liberal discovery policy which governs litigation in federal court."

The Court will not address the plaintiff's speculative policy arguments about whether or not Loctite can argue that the plaintiff did not actually suffer from Lupus after admitting that she did suffer therefrom, because a perception that she suffered from Lupus suffices under the ADA.

The Court has also found sufficient evidence in the record, regardless of the plaintiff's failure to point out such evidence in her brief, from which a jury could determine that the plaintiff did indeed suffer from Lupus. See Plf.'s Exh. 1.

that Lupus is a physiological disorder affecting certain body systems. *See also* Plf.'s Exh. 1 p.

■ The more critical question is whether the plaintiff's impairment or perceived impairment[6] substantially limited one or more of her major life activities. The plaintiff has failed to specify which of her major life activities is substantially limited by her impairment. In her brief, she merely states that, "certainly, it is reasonable to infer that suffering from periodic cerebral convulsions, seizures systematic Lupus erythematosus and tachycardia which required hospitalization in 1982, 1984, and 1988, as well as the other ailments such as arthritis, photosensitivity and renal problems, are impairments which limit one or more of the major life activities of Ms. Vega." The Court cannot agree that a reasonable jury could infer from the evidence that the plaintiff's impairment substantially limits any of her major life activities.

■ First, the Court cannot assume that the plaintiff's alleged condition substantially limits any of her major life activities without any evidence to support such a contention. Part of the purpose of the statute under which the plaintiff brings this suit is to prevent unsubstantiated stereotyping. *See* 29 C.F.R. § 1630 App. (an employee rejected from a job because of the "myths, fears and stereotypes" associated with disabilities would be covered under this part of the definition of disability ... whether or not the individual's actual physical or mental condition would be considered a disability under [ADA] ). For the plaintiff to ask the Court or the jury to simply infer than a person with Lupus is substantially limited in some life activity goes against the very mission of the statute.[7] While with certain impairments, it may be self-evident that the impaired individual is substantially limited in a major life activity—paraplegia, blindness, mental retardation, for example—we cannot say the same

thing with respect to Lupus. Even the report of the plaintiff's expert explains that the symptoms of Lupus vary. We are directed to consider whether the plaintiff's impairment substantially limits her ability to perform her major life activities on a case-by-case basis. *Abbott v. Bragdon,* 107 F.3d 934, 941 (1st Cir.1997). Therefore, by failing to identify the major life activities that her condition/perceived condition substantially limit, the plaintiff has forced the Court to examine the record for competent evidence from which a reasonable jury could determine that one of her major life activities was indeed substantially limited by her condition.

The Court, having found evidence in the record to support a reasonable jury determination either that the plaintiff suffered a Lupus condition or that the defendant regarded her as suffering a Lupus condition, must now consider both whether the actual impairment that a jury could determine afflicted the plaintiff substantially limited a major life activity or whether the impairment with which the defendant regarded her as being afflicted substantially limited a major life activities. *See Cook v. Rhode Island,* 10 F.3d 17, 25 (1st Cir.1993) ("Under the regarded as prong of section 504, a plaintiff can make out a cognizable perceived disability claim by demonstrating that she was treated as if she had an impairment that substantially limits a major life activity").

■ The Court addresses the easy issue first—no reasonable jury could conclude that the defendant perceived the plaintiff's impairment as substantially limiting a major life activity. In fact, the plaintiff's most pervasive gripe with her treatment by the defendant is that they considered her a malingerer. *See, e.g.,* Def's Exh. 2 p. 42. While certain employees at Loctite understood that the plaintiff suffered from something termed Lupus, the evidence reveals that their under-

---

**6.** As with actual impairments, perceived impairments must substantially limit at least one of the plaintiff's major life activities—i.e. the person regarding the plaintiff as having an impairment must consider that impairment as limiting the plaintiff's ability to perform a major life activity. *See Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 913 (11th Cir.1996).

**7.** It also makes the Court's task more difficult. Indeed, the Court is not obliged to search the record and attempt to develop plaintiff's case for her. *Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 260 (8th Cir.1996); *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989); *cf. Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

standing of Lupus was basic, at best (and probably derived solely from observing the plaintiff). *See* Plf.'s Exh. 16 p. 8. Whatever the defendant's employees based their understanding of the plaintiff's condition on, the evidence fails to show that they considered her substantially limited in any major life activities. In fact, quite the opposite appears to have been true—her supervisors believed she was capable of doing more than she believed herself capable of.

■ The record is also devoid of any evidence from which a reasonable jury could determine that the plaintiff was actually disabled for the purposes of the ADA. The record indicates several health related incidents/conditions experienced by the plaintiff spanning a nearly fourteen year period. In 1982, the plaintiff went to a hospital complaining of seizures. She has at unspecified times suffered from renal manifestations—blood in her urine. She claims to have had an oral ulcer, but the evidence supporting that contention is inadmissible as in violation of Rule 108(1). In her brief, the plaintiff claims to be photosensitive, but points to absolutely no evidence in support of that assertion. Citing certain lab results in the record, the plaintiff also claims to have had high antibodies at times in 1994 and 1995.[8] Finally, the plaintiff claims to suffer from arthritis. In support of this, the plaintiff first cites the deposition of Dr. Eduardo Barrios, in which the doctor states that "she did have the arthritis." The plaintiff has only supplied a single page of the deposition—page 56—and it is impossible to be sure of the context of the question. The Court cannot even be certain if the pronoun "she" refers to the plaintiff. Drawing all inferences in her favor, however, we assume that Doctor Barrios means to say that at some time, the plaintiff has suffered arthritic conditions. The plaintiff also cites the deposition of Doctor Braulio Quintero, but, as it is in the Spanish language, it is inadmissible under Rule 108(1). Finally, she cites a January 30, 1996 letter from Doctor Tomás Irizarry to Doctor Barrios, in which Dr. Irizarry states "there are degenerative changes of the hands manifested by joint space narrowing and osteophytosis most prominent at the DIP joints. No fractures or dislocations are identified."

■ Drawing all inferences in the plaintiff's favor, the Court will consider all evidence authentic. Additionally, the Court will regard all infirmities as derivative of her claimed impairment—Lupus. Viewing each of these incidents/conditions as symptoms of the plaintiff's Lupus condition, no reasonable jury could determine that the plaintiff's impairment substantially limited any of her major life activities. An illness cannot in and of itself be considered an impairment. Only its symptoms and/or ramifications actually limit the inflicted person's ability to perform major life activities. The incidents described by the plaintiff constitute the full range of symptoms and/or ramifications that a reasonable jury could possibly ascribe to her Lupus condition. These incidents are temporally spread apart, and from the evidence, nothing can be determined as to how each of the incidents affected the plaintiff. For example, the Court cannot see how occasional renal manifestations and/or a single incident of oral ulcer can arguably limit her life activities. Neither is severe, and from the evidence neither appears to have an extended duration or any long term impact. Other incidents could possibly be severe enough to limit the plaintiff if of long enough duration, such as arthritis or seizures. But from the evidence, no jury could reasonably determine that either the seizure episode or the arthritis did so limit her. No evidence has been presented explaining the severity of her arthritis, and the evidence suggests that the plaintiff suffered but a single episode of seizures in 1982 and fails to explain the severity or impact of that episode.

Even taking all of these incidents together, the Court must hold that no reasonable jury could determine that the plaintiff's claimed impairment limited any or her major life functions. As noted, the evidence fails to expressly explain the severity of the Lupus

---

8. The lab results merely give a numeric result. The Court is not qualified to determine that those numbers represent high antibodies, nor would any jury be. The plaintiff has pointed out no other evidence from which such a determination can be made.

condition, and no reasonable jury could infer, from several sporadic incidents of a non-severe nature as suffered by the plaintiff, that the overall Lupus condition affected her major life functions. In conclusion, the plaintiff is not qualified for protection from the ADA. On this basis alone, the action must be dismissed.

## B. DISCHARGE

As the Court stated above, a plaintiff bringing suit under the ADA must prove "(1) that she is disabled within the meaning of the Act; (2) that she can perform the essential functions of her job with or without reasonable accommodation; and (3) that the employer [discriminated against] her in whole or in part because of her disability." *Katz*, 87 F.3d at 30. The Court has already concluded that the plaintiff is not disabled for the purposes of the ADA as a matter of law, and so her claim must fail. Additionally, even if the plaintiff were disabled, the Court would hold that no reasonable jury could find from the evidence that the defendant discriminated against the plaintiff. The plaintiff claims that the defendant violated the ADA in three ways—by subjecting her to a hostile work environment; by asking her to undergo a medical evaluation; and by constructively discharging her. The three complaints are interrelated—the plaintiff considers the requested medical exam part of the hostile work environment that led to her constructive discharge. Each independently, if true, would constitute a violation of the ADA (if the plaintiff were disabled for the purposes of the ADA). The Court will look at each charge individually, beginning with the requested medical examination.

### 1. Requested Medical Exam

The evidence paints the following factual predicate to the defendant's request that the plaintiff submit to a medical examination. In June, 1995, the plaintiff was on vacation. Def's Exh. 2 p. 63. On July 5, 1995, upon returning from vacation, the plaintiff met with her supervisor to discuss her yearly evaluation. *Id.* at 64. Prior to that meeting, the plaintiff states, she did not inform her supervisor that she was ill, or in any other way disabled. *Id.* at 62, 67, 82–83. During the meeting, the plaintiff became very upset about the evaluation, which she considered severe, and left the meeting, requesting a meeting with James Polifka. *Id.* at 78; Def's Exh. 4 p. 101. James Polifka apparently agreed with the evaluation, which he considered to be good, overall. Def's Exh. 2 p. 78. The plaintiff worked the rest of the day, up to 5:00 p.m., and never actually informed anyone that she was feeling ill (although the plaintiff indicates, somewhat cryptically, in her deposition, that her fellow employees knew she was ill). Def's Exh. 2 p. 83. On the following day, July 6, 1995, her daughter called the office on her behalf, explaining that the plaintiff was ill and would be going to a doctor that day. On the next Monday, July 10, 1995, the plaintiff's daughter delivered a medical excuse to the defendant signed by Dr. Martinez Barrios with a diagnosis of active Lupus Erythematosus and ordering two months of home rest, through September 7, 1995. *Id.* at 90. The defendant informed the plaintiff by letter of July 11 that she would be required to provide the company with her full medical record for evaluation by an expert selected by the company. Def's Exh. 7; Plf.'s Exh. 23. The record, which was provided by Dr. Martinez Barrios on August 18, 1995, included a certification completed and signed by him diagnosing the plaintiff with "possible reactivation of Lupus." Def's Exh. 2 p. 90 (verified by reference to Def's Exh. 8).[9] After reviewing the record, Loctite requested the plaintiff to submit to a medical examination by an expert named and paid by Loctite. *Id.* at 92. On August 23, 1995, the defendant informed the plaintiff of a medical appointment for her with a specialist. *Id.* at 92. On August 24, 1995, the plaintiff resigned from her job at Loctite of Puerto Rico. *Id.* at 93 (verified by reference to Def's Exh. 1).

"Section 12112(d)(4)(A) of the ADA provides that covered entities shall not re-

---

**9.** Although defendant's exhibit 8 was submitted in violation of the rule requiring all documents be submitted in the English language, the Court will allow it for the limited purposes of clarifying the plaintiff's deposition testimony.

quire medical examinations of their employees for the purpose of determining 'whether such employee is an individual with a disability or as to the nature and severity of the disability' unless the examination 'is shown to be job-related and consistent with business necessity.'" *Yin v. State of California,* 95 F.3d 864, 867 (9th Cir.1996) (quoting 42 U.S.C. § 12112(d)(4)(A)). For the purposes of summary judgment, the Court will assume that at least one purpose of the exam was "to determine whether or not the plaintiff was an individual with a disability or the nature or severity of her disability," and that the requested examination was therefore subject to 42 U.S.C. § 12112(d)(4)(A). The Court holds, however, that the examination falls under the business necessity exception. First of all, there is no factual dispute that Loctite had been under the impression that the plaintiff suffered from a Lupus condition for some time, but had never requested that she undergo an independent medical evaluation. As the plaintiff had no substantial record of absenteeism due to illness (the longest sick leave taken by the plaintiff was five days, from October 14 to October 18, 1991, and her supervisor noted in one evaluation that "[the plaintiff] is a very responsible person and in several occasions in spite of feeling ill, she has made a great effort and complied with her responsibilities" *id.* at 36–37), a request for a two month leave of absence would certainly alert her employer to the possibility that the plaintiff could be unable to perform her job. The correlation between the plaintiff's request for medical leave and the defendant's request of the medical exam, in light of the defendant's past awareness of the plaintiff's alleged Lupus condition make it clear that the defendant did not request the exam for the sole purpose of trying to determine "whether [the plaintiff] suffered from a particular disability [and] that the defendant harbored [n]either a special bias against individuals with a given disability [n]or a general bias against all persons with disabilities." *Id.* at 868. Where a medical examination serves to determine an employee's ability to perform her job, the ADA would not prevent the plaintiff's employer from requesting the examination. 42 U.S.C. § 12112(d)(4)(B) ("a covered entity may make inquiries into the ability of an employee to perform job-related functions").

As the interpretive regulation explaining the purpose of the limitation placed on medical examinations explains, the provision was designed "to prevent the administration to employees of medical tests or inquiries that do not serve a legitimate business purpose." 29 C.F.R. § 1630 App. (Interpretive Guidance on Title I of the Americans with Disabilities Act). The interpretive regulations provide an example of a prohibited medical examination: "if an employee suddenly starts to use increased amounts of sick leave or starts to appear sickly, an employer could not require that employee to be tested for AIDS, HIV infection, or cancer unless the employer can demonstrate that such testing is job-related and consistent with business necessity." 29 C.F.R. § 1630.13(b). Thus, where an employer develops a suspicion regarding the employee's health, but has no justified concern about employee's ability to perform her job, the ADA prevents the employer from requiring the employee to submit to a medical examination. The case at bar presents a different situation—an employee, upon whom the defendant company relies, was seeking a two month leave of absence, alleging medical necessity. Certainly, an employer is justified in desiring an independent verification of the employee's medical condition. That is so, because a basic function of any full time job is showing up for work. *See Yin,* 95 F.3d at 868 (accountant's "absenteeism had a serious and deleterious toll on her productivity and overall job performance") The Court holds that where an employee requests a two month leave of absence for health reasons, an independent medical examination, the sole intention of which cannot be the search for a particular disability, requested by her employer is "job-related and consistent with business necessity."

Common sense compels this holding, for without such a rule, any individual capable of obtaining a doctor's note would be able to demand a leave of absence. The individual's employer would never be able to require an

independent evaluation, but would be forced to accept, without verification, the employee's request. The Court does not believe that was Congress' intent. The dangers of prohibiting independent medical evaluations in such a situation are made clear by the facts of this case. Here, the plaintiff admits that the doctor providing the plaintiff with a medical excuse filled in the dates of the excuse, based not in his objective, independent judgment, but on the request of the plaintiff. Def's Exh. 2 pp. 61–62. She told him that she needed a two month respite, and he filled in the medical excuse for two months. As the basis for the length of absence that he "recommended," the doctor diagnosed a "possible reactivation of Lupus."[10] This type of use of a doctor to provide medical excuses of questionable validity illustrates the business necessity of requesting independent medical evaluations prior to granting extended leave, especially for a company that has a policy of paying full salary to employees on short term disability, such as the defendant in this case. *Id.* at 94.

Another aspect of the present case that renders the defendant's request for independent medical evaluation more reasonable is the fact that the plaintiff had never formally informed her employer of any impairment. *Id.* at 105–106. While it appears that some persons working at Loctite were under the impression that the plaintiff suffered from Lupus, the plaintiff at no time ever sought any accommodations for her condition. The law cannot impose a duty on employers of all varieties to understand the symptoms and ramifications of every disease. Here, where James Polifka and Izaida Rivera were both under the belief that the plaintiff suffered from something called Lupus, the Court cannot expect them to understand and/or foresee the needs of the plaintiff. Therefore, when the plaintiff asks for a two month leave, the defendant acts reasonably in requesting an independent medical examination[11] prior to granting the request.

In summary, the Court holds that Loctite, as a matter of law, acted in a manner consistent with business necessity in requesting the plaintiff to submit to the independent medical examination. Therefore, the request was not a violation of the ADA, even if the Court had found that the plaintiff was disabled for the purposes of, and therefore protected by, the ADA.

### 2. Hostile Work Environment

■ Limited case law exists on whether the ADA will support an action based on hostile work environment. *Bryant v. Compass Bank*, 1996 WL 529214, *5 n. 3 (N.D.Ala.). The ADA's language does not explicitly prohibit harassment or a hostile work environment, but instead prohibits discrimination in the "terms, conditions, or privileges of employment." However, the Supreme Court has interpreted identical language in Title VII of the Civil Rights Act to preclude "harassment that is sufficiently severe or pervasive to 'alter the conditions or employment and create an abusive working environment.'" *Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *see also Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092 (S.D.Ga.1995):

> Interpreting Title VII the Supreme Court found that the 'terms, conditions and privileges' language 'evinces a congressional intent to strike at the entire spectrum of disparate treatment,' and that title VII affords employees the right to work in an environment 'free from discriminatory intimidation and insult.' *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). It would seem illogical to hold that ADA language identical to that of Title VII was intended to afford disabled individuals less protection than those groups covered by Title VII. The few courts addressing harassment as a basis for an ADA claim have

---

**10.** In his written medical excuse for the plaintiff, the doctor stated that the basis for the excuse was "Lupus." But when he wrote to the insurance fund, he wrote "possible reactivation of Lupus."

**11.** We note that considerable questions exist as to whether the plaintiff actually suffers from Lupus. Perhaps if the defendants had been more informed about the symptoms and severity of the disease, they never would have operated under the assumption that she in fact did have Lupus.

held that the harassment is actionable under the ADA, and have analyzed these complaints according to Title VII hostile work environment standards.

The logic expressed by Judge Edenfield in *Haysman* appears unassailable, and this Court agrees that hostile work environment claims should be actionable under the ADA, and that the analysis should borrow from hostile work environment claims under Title VII.

■■■■ To make out a claim under the ADA for hostile work environment, the plaintiff must show that the employer engaged in "harassment so severe or pervasive as to alter conditions of employment and create abusive working environment." *Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 252 n. 9 (D.D.C.1995); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). "[W]hether an environment is hostile' or abusive' can be determined only by looking at all the circumstances[, which] may include the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterances; and whether it unreasonably interferes with an employee's work performance." *Harris* at 23, 114 S.Ct. at 371.[12] In addition to proving the severity of the harassment, the plaintiff must show that the harassment was known by the employer—i.e., that the actions of the harassing employees can be imputed to the defendant employer—and that the harassment was based on the disability. *Haysman*, 893 F.Supp. at 1107.

In the case at bar, no evidence has been presented as to whether Loctite employed Izaida Rivera[13] in such a capacity that her actions could be imputed to the company, or as to whether anyone in such a position in the company knew or should have known that Izaida Rivera was harassing the plaintiff. Given that Izaida Rivera was the director of human resources at Loctite, the Court will infer that she was sufficiently high in the management structure to allow the Court to impute her actions to the defendant. Therefore, the Court will address only the severity of the harassment alleged by the plaintiff and whether a reasonable jury could find that the harassment was based on the plaintiff's disability.

The plaintiff has made very few concrete allegations of harassment. In her statement of uncontested facts, the plaintiff makes the following allegations in support of her theory that she was harassed. First, she and the defendant agree that she and Izaida Rivera did not get along. Def's Exh. 2 pp. 38–39; Plf.'s Exh. 10 pp. 17–20. The plaintiff also asserts that Izaida Rivera (1) mocked the plaintiff's condition by telling her for example, that the only thing she had was Lupus cerebritis, and that "I don't feel pity for you," Plf.'s Exh. 19 p. 132; (2) unnecessarily reprimanded her in front of visitors, (no evidence cited); (3) failed to make reasonable accommodations with regard to the plaintiff's need to visit her doctors, *id.* at 132; (4) telling the plaintiff that she did not like the way she smiles and that the plaintiff could be fired for that reason, *id.* at 134; (5) impeded a photographer from giving the plaintiff a picture he had taken of her at a company activity, *id.* at 132; and (6) suggested to another employee that the plaintiff had stolen a present given to the other employee by Loctite, Def's Exh. 2 pp. 110–111. The plaintiff further alleges that defendant (through Izaida Rivera and Luz Maldonado) "participated in an unfair evaluation process aimed at paving the way

---

**12.** There is also a subjective component to the determination. In other words, regardless of how abusive the environment would be to the reasonable person, if the plaintiff did not find the environment to be abusive, there is no violation. *Harris* 510 U.S. at 21–22, 114 S.Ct. at 370–71. "Both the objective and subjective components of this test must be satisfied for a plaintiff to establish a hostile or abusive work environment." *McClain v. Southwest Steel Co., Inc.*, 940 F.Supp. 295, 302 (N.D.Okla.1996). Because the plaintiff cannot satisfy the objective component of the test, the Court will not consider the subjective aspect. Moreover, summary judgment would be inappropriate with respect to the plaintiff's subjective reaction to her environment, because a genuine dispute lingers regarding her perceptions.

**13.** The plaintiff's entire case is based on the actions of Izaida Rivera, and the plaintiff has not alleged that any other employee subjected her to any harassment. Therefore, on summary judgment, the Court must assume that her actions can be attributed to the defendant.

for [the plaintiff's] dismissal." (No evidence cited). Another employee has provided a sworn statement that Luz Maldonado stated to him that the defendant company "wanted to get rid of" the plaintiff. *See* Plf.'s Exh. 20. Finally, the plaintiff cites the defendant's request that she submit her medical tests and undergo an independent medical examination. We analyze the evidence supporting each allegation individually, and then consider the overall pattern of conduct in which the defendant engaged.

■ First of all, the fact that the defendant and the personnel supervisor did not get along is not in and of itself evidence of harassment. Perhaps at trial such evidence might make a jury more likely to believe the allegations of harassment, but on summary judgment, where the Court draws all inferences in the respondent's favor, the fact that the plaintiff and her alleged harasser were not friendly toward each other has essentially no value as objective proof of a hostile working environment.

Next, the plaintiff, in her deposition states that Izaida Rivera made light of the plaintiff's condition:

> I remember, when I give her the note, she won't tell me, 'oh, Virginia, nice to see you back, nice that you're here.' [Instead, Izaida Rivera said] 'Lupus cerebritis, that's the only thing you have, Lupus cerebritis.'

In and of itself, such a statement, implying that the plaintiff's condition is not so severe as she makes it out to be, or even that the plaintiff is a hypochondriac, is not enough for a reasonable jury to find that the conditions of the plaintiff's employment were altered by a hostile environment. However, as part of a larger pattern, such statements could lead a reasonable jury to such a conclusion.

The plaintiff also alleges that Izaida Rivera would go to the plaintiff's desk and say, "listen to me when I talk to you," and call her "malcriada." [14] These statements, although not friendly, are not of the type that can necessarily be termed harassment, because no clear nexus exists between the

statements and the plaintiff's alleged disability. Both parties agree that the plaintiff did not get along with Izaida Rivera. Moreover, the plaintiff has testified that many people at Loctite had similarly bad relationships with Izaida Rivera. Def's Exh. 31, 46. That being the case, it is difficult for the Court to draw an inference that such statements were *based* on the plaintiff's alleged disability. However, the Court will draw that inference for the purposes of the motion at bar. Even drawing that inference, however, no reasonable jury could find that such statements, standing alone, were so abusive as to alter the conditions of the plaintiff's employment.

Next, the plaintiff's brief alleges that Izaida Rivera reprimanded her unnecessarily in front of visitors. However, no evidence has been cited in support of that allegation. The plaintiff fails to describe a single occasion in which Izaida Rivera reprimanded her in front of any one else. No incidents have been specified or described, and no proof been given regarding the "necessity" of any reprimands. Of course, it is axiomatic that a jury must base its conclusions on competent evidence, and in the absence of such evidence, the Court cannot afford the allegation any weight in the analysis.

■ Next the plaintiff claims that Izaida Rivera once told her that she could not go to the doctor because there was no one to cover for the plaintiff that day. Reasonable accommodation does not mean that the defendant must grant the plaintiff every moment off she asks for. Without more, a single instance of refusal in the face of plaintiff's request to see a physician cannot suffice to support a claim for hostile environment. This instance has very limited probative value even when taken in the context of the defendant's alleged pattern of behavior. From the evidence, the Court can see nothing unreasonable about refusing an employee's request to visit a doctor when no one was available to cover her shift. That is especially true here, were the plaintiff admits to seeing physicians on a regular basis and yet can only point to a single instance in

---

**14.** A malcriado/malcriada is Spanish for one who is rude, ill-mannered, or disrespectful.

(Translation ours).

which Izaida Rivera refused a request for time off for that purpose.[15]

The plaintiff also describes an instance in which Izaida Rivera told her, "I don't like your smile, because if you smile somebody can be fired and you claim [to be] very sick and you have nothing." Although she could not remember a single specific time when Izaida Rivera made such a comment to her, the plaintiff asserted that it occurred often. Again, standing alone, no reasonable jury could find that such a statement, even if repeated occasionally, could create a hostile work environment.

Next, the plaintiff describes an incident in which Izaida Rivera allegedly prevented a photographer from delivering a picture to the plaintiff. The plaintiff had asked the photographer to take the picture of her and her daughter at the Loctite 25th anniversary celebration, and, according to the plaintiff, Izaida Rivera told the photographer not to give her the picture. Such a minor incident could clearly not constitute harassment, but, drawing all inferences in favor of the plaintiff, the Court will lend the full force of this nearly insignificant episode to the Court's determination of whether a reasonable jury could conclude that a hostile environment existed.

Next, the plaintiff alleges that Izaida Rivera accused her of appropriating a turkey from another employee. Specifically, Loctite gave a turkey to each of its employees around Thanksgiving, and because one Pedro Segarra was unable to get his when they were given out, the plaintiff got his for him. The plaintiff alleges that Izaida Rivera accused her of stealing Pedro Segarra's turkey.[16] We are again forced to draw a very tenuous inference connecting Izaida Rivera's alleged remark and the plaintiff's disability. As with the photographer, this isolated incident offers very little support for a claim of hostile work environment.

Next, the plaintiff's brief makes the argument that the company engaged in an unfair evaluation process. The plaintiff cites no evidence to support this allegation. *See* Plf.'s Stmt. of Uncontested Mat. Facts p. 7. Moreover, the argument is undermined by the plaintiff's own testimony. At her deposition, she stated outright that her evaluations from 1988 to 1991 were fair, and that the evaluations were good. Def's Exh. 2 p. 35. She claims to have been dissatisfied with her 1992 evaluation, at which point, the evidence indicates, she asked James Polifka to reassign her to someone else's supervision. *Id.* at 33. After the plaintiff's request, James Polifka made Luz Maldonado responsible for evaluating the plaintiff, not Izaida Rivera, and the plaintiff stated in her deposition that prior to her last evaluation, she never had any problems with Luz Maldonado. *Id.* at 64. Therefore, the only evaluation that the plaintiff appears to have taken issue with was the last one. Moreover, the plaintiff has never stated nor provided evidence that tends to prove that the evaluation was unfair. In her brief, she states that the evaluation is bad because it indicates that the plaintiff needed improvement in three areas, two of which are considered important criteria for receptionists. A bad evaluation of the plaintiff's performance is not harassment unless it has been rendered unfairly due to the plaintiff's disability. No reasonable jury looking at the evidence could determine that the evaluation was unfair, and no reasonable jury could consider a fair evaluation to be probative of a hostile work environment.

Next, the plaintiff's brief cites an affidavit from one Francisco Echevarría Villarubia, who attests to certain conversations he had with Luz Maldonado about the plaintiff. However, unless the conversations were made known to the plaintiff, they could not contribute to a hostile work environment. That is so because we are looking at objective evidence of the plaintiff's work environment. Her environment is unaffected by that which she cannot perceive. By this we do not mean to say that such information

---

15. The plaintiff only remembers being denied such a request once, and that was a request to see Dr. Loyola, whom she last visited in 1989. Def's Exh. 2 pp. 53–54.

16. The evidence does not really support the accusation made in the plaintiff's brief, but the defendant's brief is in accord, so we accept it as true. *See* Plf.'s Stmt. of Uncontested Mat. Facts p. 7; Def's Stmt. of Uncontested Mat. Facts p. 14; Def's Exh. 2 pp. 110–111.

would not be relevant at trial, where the jury will be charged with weighing evidence. But on a motion for summary judgment, the Court takes for Gospel all of the evidence presented by the respondent. As the plaintiff has not even alleged that she was aware of the conversations to which Francisco Echevarría attested, those conversations and Francisco Echevarría statement have no bearing on our determination of whether a reasonable jury could find that the plaintiff's work environment was hostile.

The plaintiff's brief cites as its final instance of harassment the defendant's request that the plaintiff undergo an independent medical examination and submit her medical records. As the Court has already addressed this request and found, as a matter of law, that such a request was reasonable under the circumstances, we will not lend any weight to the request in determining whether a reasonable jury could find that the plaintiff was subjected to a hostile work environment.

Not only do none of the incidents alleged by the plaintiff, standing alone, constitute sufficient evidence from which a reasonable jury could find a hostile work environment, but the pattern they comprise also falls short, as a matter of law, of exemplifying a hostile work environment.

▆▆ Having assessed each allegation by which the plaintiff attempts to make a hostile work environment claim, the Court finds that only several of those allegations, viewed in the light most favorable to the plaintiff, are at all probative of a hostile work environment–the instance in which Izaida Rivera expressed doubt about the severity of the plaintiff's condition; instances in which Izaida Rivera told the plaintiff that she did not like her smile, intimating that she could be fired for that reason; the instance in which Izaida Rivera prevented a photographer from delivering a picture to the plaintiff; and the instance in which Izaida Rivera suggested that the plaintiff had taken another employee's turkey.

We review the above incidents in light of the criteria set out by the Supreme Court in *Harris* relating to the determination of whether employer behavior has created a hostile work environment. First, no reasonable jury could conclude that Izaida Rivera's behavior was severe or physically threatening. Second, there is no evidence that any of the conduct that might qualify as harassment took place in front of any other employees, other than the incident involving the turkey, so the episodes were not overly humiliating. While it is true that a jury could find that the verbal confrontations between Izaida Rivera and the plaintiff were frequent and persistent, these confrontations amount to nothing more than mere offensive utterances. Perhaps the plaintiff's poor relationship with Izaida Rivera created unwanted tension at her job, the plaintiff's workplace cannot reasonably be described as "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the plaintiff's employment and create an abusive working environment." *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2404–05.

In reaching this conclusion, the Court is influenced to some extent by both the close relationship the plaintiff admittedly had with the highest ranking officer at Loctite, James Polifka, and the fact that since 1991, Luz Maldonado, as opposed to Izaida River, was the plaintiff's immediate supervisor. With respect to James Polifka, whom she considered a "special" person and whom she says she will always trust, the plaintiff admits that he was fair to everyone, would not do anything illegal,[17] was directly available to her, and understood her very well. Def's Exh. 2 pp. 33, 81, 108–109. In her deposition, she relates that after her last evaluation, with which she was quite dissatisfied, she signed the evaluation against her will and expressed a desire to discuss the evaluation with James Polifka. *Id.* at 78. The next day he met with her to review her evaluation. *Id.* This anecdote illustrates James Polifka's availability to the plaintiff and the direct line of communication between the two. Likewise, after her evaluation in 1992, with which the plaintiff was dissatisfied, she complained to

---

**17.** This statement is probative of the plaintiff's relationship with and respect for James Polifka, not of his law abiding nature, with which the Court is not herein concerned.

James Polifka, asking to be reassigned to the supervision of someone other than Izaida Rivera. *Id.* at 33. James Polifka arranged the transfer, and from 1992 until she resigned, the plaintiff was under the supervision of Luz Maldonado. *Id.* This is further illustration that the plaintiff's environment was not completely beyond her own control—when she had problems, she was able to adjust her environment, or at the very least, express her problems to someone whom she considered to be fair and who wielded ultimate authority at Loctite. With respect to Luz Maldonado, the plaintiff states that at no time prior to her final evaluation in 1995, just before her resignation, she never had any problems with Luz Maldonado.

While the Court stops far short of making any blanket statement that harassment by one person who is not the victim's direct supervisor can never create a hostile work environment, in this case the fact that the only person with whom the plaintiff had problems was Izaida Rivera, who was not the plaintiff's immediate supervisor for her last three years and whose boss was directly accessible to and had a good rapport with the plaintiff, would certainly make it more difficult for a reasonable jury to find that the plaintiff was forced to endure a hostile work environment. This fact, coupled with the nature of the alleged harassment, convinces the Court that no reasonable jury could conclude that the plaintiff's work environment was hostile.

### C. Constructive Discharge

The ADA supports a claim of constructive discharge. *See, e.g., Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876 (6th Cir.1996); *Gray v. Ameritech Corp.,* 937 F.Supp. 762 (N.D.Ill.1996). In order to prevail under a constructive discharge theory, the plaintiff must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis,* 97 F.3d at 887.

The plaintiff bases her constructive discharge claim on both the allegedly hostile work environment she endured at Loctite and on the requested medical examination.

Having found, as a matter of law, that the plaintiff's evidence failed to support a colorable claim for hostile work environment and that the requested medical examination was reasonable, the Court consequently holds that the plaintiff was not constructively discharged. The test is not whether the conditions faced by the plaintiff were so unpleasant as to make a reasonable person wish to resign—the plaintiff must have been forced to endure conditions that would *compel* a reasonable person to quit. The evidence illuminates no condition or situation at her job that would have compelled a reasonable person to resign.

## V. CONCLUSION

For the reasons outlined above, the Court finds from the evidence that no reasonable jury could find for the plaintiff in this case under the Americans with Disabilities Act. Therefore, the Court hereby **DISMISSES** the plaintiff's complaint under the ADA **WITH PREJUDICE**. Having dismissed the federal question upon which jurisdiction was based, the Court hereby refuses to exercise supplemental jurisdiction over the plaintiff's Commonwealth claim, and hereby **DISMISSES WITHOUT PREJUDICE** the plaintiff's claim under Puerto Rico law for accrued sick leave.

IT IS SO ORDERED.