**Ana Julia TORRES–ALMÁN, Plaintiff**

v.

**VERIZON WIRELESS PUERTO RICO, INC.; Verizon Information Services– Puerto Rico Inc., S. En C.; Axesa Servicios De Información, S. En C., Defendants.**

Civil No. 06–1967(JAG/MEL).

United States District Court,
D. Puerto Rico.

Nov. 13, 2007.

Anibal Escanellas–Rivera, Escanellas & Juan, San Juan, PR, for Plaintiff.

Jorge A. Antongiorgi, Miguel A. Rivera–Arce, Maralyssa Alvarez–Sanchez, McConnell Valdes, San Juan, PR, for Defendants.

## OPINION AND ORDER

MARCOS E. LÓPEZ, United States Magistrate Judge.

### I. Introduction

On September 26, 2006, plaintiff Ana Julia Torres–Almán ("Torres") filed the complaint in this case pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, the Age Discrimination in Employment Act, as amended, ("ADEA"), 29 U.S.C. §§ 621–634, and the Civil Rights Act of 1964 and 1991, as amended ("Title VII"), 42 U.S.C. §§ 2000e–2000e–15, against: (1) Verizon Wireless Puerto Rico, Inc.; (2) Verizon Information Services–Puerto Rico, Inc., S. en C.; and (3) Axesa Servicios de Información, S. en C. ("Axesa"). Torres claims discrimination by age and disability, as well as by her association with a disabled person. Torres also claims denial of a reasonable accommodation, retaliation due to her opposition and participation against defendants' alleged unlawful employment practices, and violation of her civil rights. Docket No. 1. Additionally, Torres requests the court to exercise its supplemental jurisdiction over state law claims pursuant to Law Num. 80 of May 30, 1976, as amended, P.R. Laws Ann., tit. 29, §§ 185(a)–185(m) ("Law 80"); Law Number 44 of June 2, 1985, as amended, P.R. Laws Ann., tit. 1, §§ 501–511(b) ("Law 44"); and Law 100 of June 30, 1959, as amended, P.R. Laws Ann., tit. 29, §§ 146–151 ("Law 100").[1]

On September 21, 2007, Axesa moved for summary judgment on Torres's claims. Docket Nos. 33–34. On October 23, 2007, Torres opposed the request for summary judgment. Docket No. 42. Axesa replied on November 2, 2007. Docket Nos. 53–54.

### II. Factual Background

The following material facts are not in genuine issue or dispute pursuant to the

---

1. On December 8, 2006, Puerto Rico Telephone Company, Inc. ("PRTC"), submitted a motion to dismiss stating that said entity had been improperly named in the complaint as Verizon Wireless Puerto Rico, Inc., and alleging that the complaint against PRTC should be dismissed because PRTC was not Torres' employer and, therefore, it was in no way liable to her. Docket No. 14. On February 23, 2007, the parties filed a entered a joint stipulation of dismissal whereby the parties requested the court to dismiss with prejudice all claims asserted against PRTC (improperly named in the complaint as Verizon Wireless Puerto Rico, Inc.). Docket No. 20. Accordingly, on June 26, 2007, the court entered a partial judgment dismissing with prejudice all claims against PRTC. Docket No. 26.

stipulations and supporting evidence submitted by the parties:

1. Axesa is a company authorized to do business in the Commonwealth of Puerto Rico. Docket No. 34, ¶ 1; Docket No. 42, "Plaintiff's Statement of Contested and Uncontested Facts in Support of her Opposition to Defendant's Motion for Summary Judgment" ("SCUF"), ¶ 1.

2. Axesa is a company with local offices at San Roberto Street, Río Piedras, Puerto Rico, which publishes the "Yellow Pages" book, the "Mobile Guide," the "Business Register," "Places To Go," "Bienvenidos," as well as two other electronic products. Docket No. 34, ¶ 2; Docket No. 42, SCUF, ¶ 1.

3. Axesa was formerly known as Verizon Information Services–Puerto Rico, Inc., S. en C. Docket No. 34, ¶ 3; Docket No. 42, SCUF, ¶ 1.

4. Torres was born on May 14, 1965. Docket No. 34, ¶ 4; Docket No. 42, SCUF, ¶ 1.

5. Torres has eleven brothers and sisters. Three of her brothers and sisters live in the United States and the remaining eight live in Cayey, Puerto Rico. Docket No. 34, ¶ 5; Docket No. 42, SCUF, ¶ 1.

6. Torres began working at Axesa as a Sales Supervisor on January 29, 2001. Docket No. 34, ¶ 6; Docket No. 42, SCUF, ¶ 1.

7. Torres received a copy of Axesa's Code of Conduct and participated in a training session of the same. Docket No. 34, ¶ 7; Docket No. 42, SCUF, ¶ 1.

8. Axesa sells space in its business products during sales campaigns known as "Sales Canvasses". Each sales canvass has a specific time frame and targets sales in a specific geographical area or for a specific product. The "Isla" canvass targets sales to Axesa's clients outside of the San Juan Metropolitan Area. The "Metro" canvass targets sales to clients in the San Juan Metropolitan Area. Docket No. 34, ¶ 8; Docket No. 42, SCUF, ¶ 1.

9. At the beginning of each sales canvass, Axesa establishes specific objectives in terms of the amount of sales to be attained during the canvass. An important part of the sales representatives' responsibilities and functions is reaching that sales objective. Docket No. 34, ¶ 9; Docket No. 42, SCUF, ¶ 1.

10. When Torres began working at Axesa, she was a Sales Supervisor in the New Media Department under the supervision of Luz Eneida Torres. Docket No. 34, ¶ 10; Docket No. 42, SCUF, ¶ 1.

11. As a Sales Supervisor, Torres was responsible for training, evaluating and developing the Sales Representatives under her supervision in order to achieve the sales revenue objectives established by Axesa for each sales canvass. Docket No. 34, ¶ 11; Docket No. 42, SCUF, ¶ 1.

12. On or around April 2002, Torres was transferred to the position of Sales Supervisor in the Premise Division. Docket No. 34, ¶ 12; Docket No. 42, SCUF, ¶ 1.

13. The Premise Division at Axesa is responsible for direct sales to Axesa's clients. The sales objectives for the Premise Division are higher than the sales objectives for the New Media Division. Torres' position as a Sales Supervisor in the Premise Division involved more responsibilities and more pressure because of the higher sales objectives. Docket No. 34, ¶ 13; Docket No. 42, SCUF, ¶ 1.

14. As a Sales Supervisor in the Premise Division, Torres once supervised Enid Cintrón ("Cintrón") and trained her as a sales representative. Eventually, Cintrón also became a Supervisor in the Premise Division. Docket No. 34, ¶ 14; Docket No. 42, SCUF, ¶ 1.

15. As a Sales Supervisor in the Premise Division, Torres was supervised by Lo-

relli Navarro ("Navarro"), Sales Manager for the Premise Division. Docket No. 34, ¶ 15; Docket No. 42, SCUF, ¶ 1.

16. On or around July of 2004, Michael Báez ("Báez") offered Torres the position of Major Accounts Representative in the Premise Division. Docket No. 34, ¶ 16; Docket No. 42, SCUF, ¶ 1.

17. At all relevant times, Báez has been Axesa's Director of Sales and Cintrón's and Navarro's supervisor. Docket No. 34, ¶ 17; Docket No. 42, SCUF, ¶ 1.

18. Torres accepted the transfer to the Major Accounts Representative position conditioned upon her not being supervised by Carlos Villafañe. Axesa granted Torres' request and, effective August 9, 2004, Torres was transferred to the position of Major Accounts Representative in the Premise Division. Docket No. 34, ¶ 18; Docket No. 42, SCUF, ¶ 1.

19. As a Major Account Representative in the Premise Division, Torres did not supervise any employees. Instead she was responsible for: selling advertising in telephone directories to key clients; providing customer service to key clients; developing and delivering presentations regarding Axesa's products; maintaining and submitting sales reports regarding sales to clients; assisting formal training; and working and managing rejects as well as working with the Arts Department, among others. Docket No. 34, ¶ 19; Docket No. 42, SCUF, ¶ 1.

20. As a Major Account Representative in the Premise Division, Torres was also responsible for developing forecasts and projections as to her expected sales. Torres could revise her forecasts in the middle of a sales canvass in order to adjust them to what she estimated her final sales would be at the end of a canvass. Docket No. 38, Exhibit 1c, pages 116–119.

21. The preparation of forecasts is an important function of a Major Account Representatives at Axesa because, based on the forecasts provided by the representatives, Axesa's upper management estimates Axesa's expected sales and profits. If there is a significant discrepancy between the forecasts and the actual sales, the results of the canvass are affected. Docket No. 38, Exhibit 1c at 144.

22. The Metro 2005 Canvass began on or around the first week of August 2004 and ended on or around the first week of March 2005. As a Major Accounts Representative in the Premise Division, Torres' direct supervisor during the Metro 2005 Sales Canvass was Enid Cintrón, who was in turn supervised by Lorelli Navarro, Sales Manager for the Premise Division. Docket No. 34, ¶ 22; Docket No. 42, SCUF, ¶ 1.

23. In addition to Torres, there were two other Major Accounts Representatives Premise Division, José Rosich and Darlene Matos, who were supervised by Carlos Villafañe. Docket No. 34, ¶ 23; Docket No. 42, SCUF, ¶ 1.

24. In August 2004, prior to her being diagnosed with breast cancer, the amount of clients assigned to her was higher than the other two Major Accounts Representatives in the Premise Division. Docket No. 34, ¶ 24; Docket No. 42, SCUF, ¶ 1.

25. For the Metro 2005 Sales Canvass, Torres' Net Increase Sales Objective was $25,570. Docket No. 34, ¶ 25; Docket No. 42, SCUF, ¶ 1.

26. For the Metro 2005 Sales Canvass, Darlene Matos' Net Increase Sales Objective was $26,807. Docket No. 34, ¶ 26; Docket No. 42, SCUF, ¶ 1.

27. For the Metro 2005 Sales Canvass, José Rosich's Net Increase Sales Objective was $25,135. Docket No. 34, ¶ 27; Docket No. 42, SCUF, ¶ 1.

28. The Isla 2005 Sales Canvass began on or around March 2005 and ended on or

around the first week of August 2005. Docket No. 34, ¶ 28; Docket No. 42, SCUF, ¶ 1.

29. For the Isla 2005 Sales Canvass, Torres' Net Increase Sales Objective was $6,783. Docket No. 34, ¶ 29; Docket No. 42, SCUF, ¶ 1.

30. For the Isla 2005 Sales Canvass, Darlene Matos' Net Increase Sales Objective was $8,239. Docket No. 34, ¶ 30; Docket No. 42, SCUF, ¶ 1.

31. For the Isla 2005 Sales Canvass, Juan Rosich's Net Increase Sales Objective was $8,239. Docket No. 34, ¶ 31; Docket No. 42, SCUF, ¶ 1.

32. On or around June 27, 2005, Torres prepared a forecast with her revised projections as to her expected sales results for the Isla 2005 canvass. Docket No. 38, Exhibit 1c, page 144.

33. During 2005, Axesa also engaged in a sales campaign for the "Guía Móvil" and United States Virgin Islands ("USVI") business products. Docket No. 34, Exhibit 2, ¶ 3.

34. In the middle of the "Guía Móvil" and "USVI" canvass, Torres took vacation leave from August 18, 2005, through August 24, 2005. Docket No. 38, Exhibit 1c, page 149; Exhibit 4, ¶ 5.

35. On August 29, 2005, Cintrón sent Torres an e-mail indicating that the "Guía Móvil" and "USVI" sales campaign had been extended until September 9, 2005. The e-mail also indicated that Torres' performance would be evaluated at the end of the campaign. Docket No. 34, ¶ 48; Docket No. 42, SCUF, ¶ 1.

36. On August 30, 2005, Torres submitted a letter notifying her resignation in which she stated that she "was grateful for the rewarding employment" she had with Axesa. Torres resignation was effective September 2, 2005. Docket No. 34, ¶ 49; Docket No. 42, SCUF, ¶ 1.

37. When Torres resigned from Axesa, she was approximately 40 years and 3 months old. Docket No. 34, ¶ 50; Docket No. 42, SCUF, ¶ 1.

38. During her employment with Axesa, Torres received salary increases every year. Docket No. 38, Exhibit 1c, page 108.

39. At the time of her resignation, Torres was earning an annual base salary of $45,500 plus commissions as well as a car and cellular phone allowance. Docket No. 38, Exhibit 1c, page 218; *see also* Docket No. 30 (Joint Proposed Pre–Trial Order), Section IV, Stipulated Facts, ¶ 14, page 45.

40. Torres cannot remember all the client names or the dates when she allegedly requested that Cintrón visit clients with her. Docket No. 38, Exhibit 1c, pages 165–70.

41. During the Metro 2005 and Isla 2005 sales canvasses, Cintrón visited the following clients with Torres on "coaching" visits: Mangual Services and the "Office Gallery" client in June of 2005. Docket No. 34, Exhibit 10, ¶ 7.

42. Dr. Edmée Soltero is a general surgeon at "Centro Estereodáctico de la Mujer" at El Maestro Hospital. Docket No. 34, ¶ 56; Docket No. 42, SCUF, ¶ 1.

43. On November 4, 2004, the results of a stereotactic biopsy performed by Dr. Soltero on October 28, 2004, revealed that Torres had a form of breast cancer known as *Ductal Carcinoma In Situ* in her left breast. Docket No. 34, ¶ 57; Docket No. 42, SCUF, ¶ 1.

44. *Ductal Carcinoma In Situ* is cancer located in the milk ducts of the breasts. Docket No. 34, ¶ 58; Docket No. 42, SCUF, ¶ 1.

45. According to Torres, her breast cancer was treatable and her left breast could be saved. Docket No. 34, ¶ 59; Docket No. 42, SCUF, ¶ 1.

46. A lumpectomy is an operation where the cancerous tissue as well as the surrounding tissue is removed from the breast. Docket No. 34, ¶ 63; Docket No. 42, SCUF, ¶ 1.

47. On November 24, 2004, Dr. Soltero performed an ambulatory lumpectomy to remove cancerous tissue from Torres' left breast. The lumpectomy procedure was successful in removing all of the cancerous tissue from Torres' left breast. Docket No. 34, ¶ 62; Docket No. 42, SCUF, ¶ 1.

48. After undergoing the lumpectomy procedure, Torres returned to work on Monday, November 29, 2004. Docket No. 34, ¶ 64; Docket No. 42, SCUF, ¶ 1.

49. The only physical limitation resulting from her breast cancer was the temporary inability to lift objects with her left arm after undergoing the lumpectomy procedure. Docket No. 34, ¶ 65; Docket No. 42, SCUF, ¶ 1.

50. Torres and Dr. Soltero admit that this was a temporary restriction that lasted at most, three (3) months. Docket No. 34, ¶ 66; Docket No. 42, SCUF, ¶ 1.

51. Torres never submitted to Axesa a medical certificate from her doctor indicating that she could not lift objects with her left arm. Docket No. 34, ¶ 67; Docket No. 42, SCUF, ¶ 1.

52. At all times, Torres could walk, communicate, cook, take care of herself, write, travel, concentrate, clean her house, and was able to perform the functions of her job. Docket No. 34, ¶ 68; Docket No. 42, SCUF, ¶ 1.

53. Torres also received radiotherapy treatment at Marcial Radiation Oncology Center from February 28, 2005, through April 13, 2005. Docket No. 34, ¶ 69; Docket No. 42, SCUF, ¶ 1.

54. Torres continued working during the first month she received radiotherapy treatment. Docket No. 34, ¶ 70; Docket No. 42, SCUF, ¶ 1.

55. The treatment prescribed for Torres' breast cancer consisted of a single lumpectomy and subsequent radiotherapy sessions. Docket No. 34, ¶ 71; Docket No. 42, SCUF, ¶ 1.

56. After finishing radiotherapy sessions in April 2005, Torres has not undergone any additional treatment for breast cancer. Docket No. 34, ¶ 72; Docket No. 42, SCUF, ¶ 1.

57. As of April 9, 2007, Dr. Soltero has not detected any other malignant cancerous tissue in Torres' breast. Docket No. 34, ¶ 73; Docket No. 42, SCUF, ¶ 1.

58. Neither Cintrón nor Navarro made any negative comments to Torres regarding the time she took to go to medical appointments or receive radiotherapy treatment. Docket No. 38, Exhibit 1a, pages 43–44, 88, 89.

59. Torres never submitted any medical certificate or document to her supervisors or to Human Resources concerning a request for accommodation. Docket No. 38, Exhibit 1a, pages 65–66, 68, 73, 79–80, 88.

60. Torres admitted that she did not feel disabled and, in her opinion, she could do her job. Docket No. 38, Exhibit 1a, page 81.

61. Torres took a short term disability leave from March 29, 2005 to April 22, 2005. Docket No. 34, ¶ 78; Docket No. 42, SCUF, ¶ 1.

62. While Torres was on leave, she visited the offices of Madeline Jimenez, a psychologist working at the Centro Psiquiátrico Lucy Loópez Roig. During a session on March 29, 2005, Torres told Ms. Jiménez that she "got along with her superiors". Docket No. 34, ¶ 79; Docket No. 42, SCUF, ¶ 1.

63. Jiménez never diagnosed Torres with a mental or emotional condition. Docket No. 38, Exhibit 12, pages 35–36, 60.

64. During the course of five (5) sessions with Ms. Jiménez between the months of March, April and May of 2005, Torres did not indicate to Ms. Jiménez that she felt discriminated against or harassed. Docket No. 38, Exhibit 12, pages 65–66.

65. When Torres returned from her short term disability leave, her sales quota was adjusted in order to take into consideration the time she was on short term disability. Docket No. 38, Exhibit 1a, page 90; Exhibit 10, ¶ 6.

66. On or around November 2004, Torres' mother was diagnosed as terminally ill. Docket No. 34, ¶ 83; Docket No. 42, SCUF, ¶ 1.

67. On or around November 2004, Torres' mother began receiving hospice care at her home. Docket No. 34, ¶ 84; Docket No. 42, SCUF, ¶ 1.

68. Torres' brother and sisters also helped take care of their mother. Docket No. 34, ¶ 85; Docket No. 42, SCUF, ¶ 1.

69. Torres' mother died on April 28, 2005. Docket No. 34, ¶ 87; Docket No. 42, SCUF, ¶ 1.

70. At the time of her death, Torres' mother lived with her brother, José Rafael Torres, in Cayey, Puerto Rico. Docket No. 34, ¶ 88; Docket No. 42, SCUF, ¶ 1.

71. Torres cannot remember which clients assigned to her were allegedly taken away from her in November and December 2004, and to which sales representatives were they allegedly reassigned. Docket No. 38, Exhibit 1c, pages 201–02.

72. The only time Torres' clients were re-assigned was for the period of time that she was on short term disability leave from late March to mid-April 2005. Docket No. 34, Exhibit 10, ¶ 8.

73. Torres established her own company, a home cleaning service called "AT Home Maid Services", in October 2006. The company was incorporated on October 10, 2006. Docket No. 34, ¶ 91; Docket No. 42, SCUF, ¶ 1.

74. As owner of her business, Torres alleges she currently works seven (7) days a week and performs the functions of an administrator, a secretary and a receptionist. Docket No. 34, ¶ 92; Docket No. 42, SCUF, ¶ 1.

75. At all relevant times, Axesa has had in full force and effect a policy which prohibits discrimination. Docket No. 34, ¶ 93; Docket No. 42, SCUF, ¶ 1.

76. Torres admits she had a good relationship with Navarro. On March 1, 2005, Torres sent Navarro an e-mail thanking her for her support and help during the difficult time. Torres also brought Navarro a card and gift in thanks. Docket No. 38, Exhibit 1a, pages 120–21; Exhibit 13.

77. Cintrón was born on May 17, 1967. Docket No. 34, ¶ 95; Docket No. 42, SCUF, ¶ 1.

78. As a Sales Supervisor, the part of Cintrón's salary that corresponded to commissions was, in part, dependent on whether the sales representatives she supervised reached their sales objectives. Docket No. 34, ¶ 96; Docket No. 42, SCUF, ¶ 1.

### III. Summary Judgment Standard

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c), 28 U.S.C.; *see also Santia-*

*go–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52. (1st Cir.2000).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c), 28 U.S.C. The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented before the court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine". "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to "defeat a properly supported motion for summary judgment." *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)...." *Greenburg v. Puerto Rico Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987).

■ Finally, when considering a request for summary judgment, unsettled issues of motive and intent as to the conduct of any party will normally preclude the court from granting summary judgment. *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 677 (1st Cir.1996) (reversing summary judgment and emphasizing that "determinations of motive and intent ... are questions better suited for the jury") (internal quotation marks omitted) (citation omitted); *see also Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1551, 1555 (S.D.Fla.1990) ("Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontroverted proof of a 'smoking gun.' "); *Pearson v. First N H Mortgage Corp.,* 200 F.3d 30, 35, n. 2 (1st Cir.1999). However, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely

upon conclusory allegations, improbable inferences [or] unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 95 (1st Cir.1996).

## IV. Legal Analysis

### A. Title VII claims.

■ Under Title VII, it is an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). A plain reading of the statute reveals that Title VII bars only discrimination on the basis of race, color, religion, sex, and national origin, and does not provide a cause of action for claims of age or disability discrimination. Since Torres' claims are based on age and disability discrimination and retaliation, said claims may not be brought pursuant to Title VII. Thus, the request for summary judgment is GRANTED regarding Torres' claims under Title VII. *See Villegas–Reyes v. Universidad Interamericana de P.R.,* 476 F.Supp.2d 84, 92 (D.P.R.2007) *(sua sponte* dismissal with prejudice for failure to state a Title VII claim is warranted where plaintiff only alleged discrimination based on age and disability); *Marrero v. Schindler Elevator Corp.,* 494 F.Supp.2d 102, 111 (D.P.R.2007) (same).

### B. ADA claims.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The purpose of the ADA is to protect qualified persons with a disability from discrimination in employment. 42 U.S.C. § 12112(a). The ADA prohibits discrimination against an otherwise qualified individual based on his or her disability in all employment practices, including, but not limited to job application procedures, hiring, firing, advancement and compensation. *Id.* Discrimination under the ADA also includes not "making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless ... the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

■ In order to establish a claim under the ADA, in the absence of direct evidence of discrimination, a plaintiff must rely on circumstantial evidence and establish a *prima facie* case through the burden shifting method developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir.1999); *Laurin v. Providence Hosp.,* 150 F.3d 52, 58 (1st Cir.1998); *Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 278–79 (D.P.R.1999).

■ To establish a *prima facie* case under the ADA, plaintiff must prove by a preponderance of the evidence: (1) that he is disabled within the meaning of the ADA; (2) that he is able to perform the essential functions of his job, with or without reasonable accommodation; and (3) that the adverse employment decision was based in whole or in part on his disability. *Phelps v. Optima Health Inc.,* 251 F.3d 21, 24 (1st Cir.2001); *Marcano–Rivera v. Pueblo Int'l.,* 232 F.3d 245, 251 (1st Cir.2000); *Garcia–Ayala v. Lederle Parenterals Inc.,* 212 F.3d 638, 646 (1st Cir.2000). If the plaintiff succeeds in establishing a *prima facie* case, then the employer must articulate a legitimate non-discriminatory (or non-retaliatory) reason for the adverse employment action taken. *Laurin v. Providence Hosp.,* 150 F.3d 52, 58 (1st Cir.1998); *Champagne v. Servistar Corp.,* 138 F.3d 7, 12 (1st Cir.1998); *Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 286 (D.P.R.

1999). The employer has a burden of production only; the burden of proving an improper motive always remains with the plaintiff. *Dichner v. Liberty Travel,* 141 F.3d 24, 30 (1st Cir.1998). Once the employer meets this burden, the inference of a discriminatory (or retaliatory) motive created by the *prima facie* case dissolves. *Id.* The plaintiff then has the burden of establishing both that the employer's proffered reason is merely a pretext and that the real reason is a discriminatory (or retaliatory) animus. *Id.; Champagne,* 138 F.3d at 12–13.

### 1. *Prima facie* disability discrimination case.

■ The threshold question in any ADA action is whether the plaintiff can make a showing of disability. *Lessard v. Osram Sylvania, Inc.,* 175 F.3d 193, 197 (1st Cir.1999); *Velez v. Janssen Ortho LLC,* 389 F.Supp.2d 253, 263 (D.P.R.2005). A disability under the ADA is a physical or mental impairment that substantially limits one or more of a person's major life activities. 42 U.S.C. § 12102(2)(A)-(C); *see also Santiago Clemente v. Executive Airlines,* 213 F.3d 25, 30 (1st Cir.2000). In order to determine whether a person is disabled under the ADA, the Court must conduct a tripartite analysis. *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Carroll v. Xerox Corp.,* 294 F.3d 231, 238 (1st Cir.2002). First, plaintiff must prove that he suffers from a physical or mental impairment. *Carroll,* 294 F.3d at 238.[2] Second, the Court must evaluate the life activities affected by the impairment to determine if they constitute a "major" life activity. *Id.*[3] Lastly, "tying the two statutory phrases together, we ask whether the impairment substantially limits the activity found to be a major life activity." *Id.; Lebron–Torres v. Whitehall Labs.,* 251 F.3d 236, 239–40 (1st Cir.2001).[4] Furthermore, plaintiff must possess a record of such impairment and be regarded as having such an impairment. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(e)(2)(g)(1)(2)(3).

■ In this case, Torres bases her claims under the ADA on the fact that she was diagnosed with breast cancer. Breast cancer *per se* is not sufficient to render a person diagnosed with, or suffering from,

**2.** Under ADA regulations, a physical or mental health impairment is defined as: "Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(1).

**3.** ADA regulations define "major life activity" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

**4.** According to ADA regulations, the term "substantially limits" means that the person is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Said regulations further provide that, in evaluating whether an individual is substantially limited in a major life activity by reason of an impairment, the following factors should be considered: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Id.,* § 1630.2(j)(1).

said condition automatically disabled for purposes of the ADA. Although breast cancer may be an impairment within the meaning of the ADA, in order for such condition to constitute a disability, the same must substantially limit the performance of one or more of plaintiff's major life activities. *See Pimental v. Dartmouth–Hitchcock Clinic*, 236 F.Supp.2d 177 (D.N.H.2002) (dismissing claims of disability where plaintiff took eight month medical leave for breast cancer surgery and treatment because plaintiff's conditions did not qualify as a disability under the ADA); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir.1996) (affirming dismissal of claims of disability where plaintiff suffered from breast cancer, which required radiation treatment, necessitating a modified work schedule for one month and a half, and caused significant side effects for an additional four months; plaintiff's conditions did not substantially limit her work activity and thus did not qualify as a disability under the ADA); *Schwertfager v. City of Boynton Beach*, 42 F.Supp.2d 1347 (S.D.Fla.1999) (plaintiff's breast cancer did not substantially limit her in major life activities, even though her surgery caused her to be temporarily unable to care for, dress, and cook for herself); *Madjlessi v. Macy's W., Inc.*, 993 F.Supp. 736 (N.D.Cal. 1997) (employee's breast cancer did not substantially limit her ability to work).

 In this case, Torres' disability discrimination claims under the ADA fail to meet the first prong of the *prima facie* case. It is uncontested that:

1. Torres' breast cancer was treatable and her left breast could and was saved.

2. The lumpectomy procedure performed by Dr. Soltero on November 24, 2004, was successful in removing all of the cancerous tissue from Torres' left breast. On November 29, 2004, just a few days after undergoing the lumpectomy procedure, Torres returned to work.

3. The only physical limitation resulting from her breast cancer, was Torres' temporary inability to lift objects with her left arm after undergoing the lumpectomy procedure. However, Torres and Dr. Soltero admit that this was a temporary restriction that lasted at most, three months.

4. At all times, Torres could walk, communicate, cook, take care of herself, write, travel, concentrate, clean her house, did not feel disabled and was able to perform her functions of her job.

5. Torres received radiotherapy treatment at Marcial Radiation Oncology Center from February 28, 2005, through April 13, 2005. Torres continued working during the first month she received radiotherapy treatment.

6. After finishing radiotherapy sessions in April 2005, Torres has not undergone any additional treatment for breast cancer. As of April 9, 2007, Dr. Soltero has not detected any other malignant cancerous tissue in Torres' breast.

7. On October, 2006, Torres established her own home cleaning company, called "AT Home Maid Services", in which works seven days a week as an administrator, secretary and receptionist.

The only evidence submitted by Torres in support of her claim that she was disabled for purposes of the ADA is that: (1) she was diagnosed with breast cancer; (2) she had to undergo a lumpectomy procedure; (3) she had to receive radiotherapy for almost two months; and (4) she was temporarily unable to lift objects with her left arm after undergoing the lumpectomy procedure. Said evidence is insufficient to allow such conclusion.

First, even though Torres claims that she was disabled and required reasonable accommodation to continue working, she asserts in the complaint that after being

diagnosed with breast cancer, she "continued working and performing her duties in an excellent manner" and that although she had to be absent in order to receive treatment, "she adjusted her therapies to her working shifts, to be able to perform her duties and functions." Docket No. 1, ¶ 10.

Second, Torres can not rely on her diagnosis alone to prove disability under the ADA. As stated by the Supreme Court in *Toyota Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002):

> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial."

*Id.*, at 198, 122 S.Ct. 681; *see also Calef v. Gillette Co.*, 322 F.3d 75, 83 (1st Cir.2003); *Carroll*, 294 F.3d at 238; *Alamo–Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 156 (D.P.R.2003).

Third, the fact that Torres has not undergone any additional treatment for breast cancer since April 2005 (several months prior to her resignation) and that approximately two years later no malignant cancerous tissue has been detected further operates against a conclusion that Torres is or was disabled for purposes of the ADA. To that extent, it has been established that:

> A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected, it does not "substantially limi[t]" a major life activity.

*Sutton v. United Air Lines*, 527 U.S. 471, 482–83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

Fourth, Torres' temporary inability to lift objects does not render her disabled for purposes of the ADA. Lifting is a major life activity. *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 21 (1st Cir.2002) ("Whether lifting pen to paper or glass to mouth, lifting is an integral part of everyday life and seems to fit comfortably within the parameters set by the Court. We conclude, therefore, that the EEOC appropriately interpreted the statute, ... and that lifting is a major life activity.")(internal citations omitted). Courts, however, have also consistently held that, in order for an impairment to be "substantially limiting" within the meaning of the ADA, said impairment must be permanent or long term. *See Toyota*, 534 U.S. at 198, 122 S.Ct. 681 ("We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term."); *Guzman–Rosario v. United Parcel Service, Inc.*, 397 F.3d 6, 10 (1st Cir.2005) (in order to be "substantially limiting" within meaning of ADA's definition of disability, impairment must be permanent or long term; this may encompass conditions that are potentially long-term, in that their duration is indefinite and unknowable, but not those that are brief or foreseeably temporary.); *Rivera Abella v. Puerto Rico Telephone Co.*, 470 F.Supp.2d 86, 98 (D.P.R.2007). In this case, it is uncontested that Torres' impairment to lift objects lasted only several months. Furthermore, Torres has not provided any

evidence that her work as Major Accounts Representative involved lifting heavy objects.

In light of the above, the court determines that Torres' breast cancer condition did not render her disabled within the meaning of the ADA. As such, she fails to meet the first prong of the *prima facie* disability discrimination case. Consequently, the motion for summary judgment regarding Torres' disability discrimination claims under ADA is hereby GRANTED.[5]

### 2. Reasonable accommodation claims.

Torres also bring claims against Axesa for its alleged failure to provide her with a reasonable accommodation as required by the ADA. In particular, Torres alleges that, on November, 2004, she informed Navarro and Cintrón that she had just been diagnosed with breast cancer and that she was going to require medical treatment for said condition. In order to continue working while taking care of her medical condition, she requested as a reasonable accommodation: (1) that her work schedule be reduced; (2) a reduction of clients; (3) a reduction of her Net Sales Objectives; (4) a "change" of the list of clients that Cintrón referred to her; and (5) a reduction of her daily sales quota and the accounts that she had to "close" on a daily basis. Torres alleges that neither Cintrón nor Navarro provided any of the accommodations she requested. Docket No. 42, Exhibit 1 (Torres' Sworn Statement, ¶¶ 17, 23–25, 27).

The definition of discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the [entity's] business." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" includes "[m]odifications or adjustments ... to the manner or circumstances under which the position ... is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). "A 'reasonable accommodation' is one which would enable the plaintiff to perform the essential functions of her job and at least on the face of things is feasible for the employer under the circumstances." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 148 (1st Cir. 2006) (*citing Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir.2001)).

In order to survive a motion for summary judgment on a reasonable accommodation claim under the ADA, the plaintiff must "produce enough evidence for a reasonable jury to find that (1) he is disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff]'s disability, did not reasonably accommodate it." *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir.2003).

Insofar Torres has failed to produce sufficient showing that her breast cancer condition rendered her disabled within the meaning of the ADA, Torres' reasonable accommodation claims must likewise fail. Consequently, the motion for summary judgment regarding Torres' ADA claims for failure to provide reasonable accommodation is hereby GRANTED.[6]

---

**5.** The conclusion that Torres fails to meet the first prong of the *prima facie* disability discrimination case makes it unnecessary to entertain an analysis of the remaining prongs of said test.

**6.** Furthermore, as to the specific requests for reasonable accommodation made by Torres, the court notes that she admits as uncontested facts that: (1) she never submitted any medi-

### 3. Claims based on Torres' association with a disabled individual.

Torres also bring claims under 42 U.S.C. § 12112(b)(4), ADA's "association provision". In particular, she alleges that on November 2004, she informed Navarro that she had to take care of her mother, who was bedridden and terminally ill with Parkinson's disease, a severe heart condition and a severe mental and emotional condition, and that, in order to continue working while taking care of her mother, she requested and was denied reasonable accommodations.

■■■ ADA's "association provision" protects qualified individuals from employment discrimination based on the "known disability of an individual with whom the qualified individual is known to have a

relationship or association." 42 U.S.C. § 12112(b)(4).[7] "The legislative history of section 12112(b)(4) makes clear that the provision was intended to protect qualified individuals from adverse job actions based on 'unfounded stereotypes and assumptions' arising from the employees' relationships with particular disabled persons." *Oliveras–Sifre v. Puerto Rico Dept. of Health*, 214 F.3d 23, 26 (1st Cir.2000) *(citing Barker v. International Paper Co.*, 993 F.Supp. 10, 15 (D.Me.1998); Den *Hartog v. Wasatch Academy*, 129 F.3d 1076, 1081–85 (10th Cir.1997)). The relationship between the employee and the disabled associate "need not be a familial relationship, but can extend to business, social or other relationships or associations." *Sifre v. Department of Health*, 38 F.Supp.2d 91, 100 (D.P.R.1999), *aff'd*, 214 F.3d 23 (1st Cir. 2000).[8] "A family relationship is the para-

cal certificate or document to her supervisors or to Human Resources concerning a request for accommodation; (2)when Torres returned from her short term disability leave, her sales quota was adjusted in order to take into consideration the time she was on short term disability; (3) neither Cintrón nor Navarro made any negative comments to Torres regarding the time she took to go to medical appointments or receive radiotherapy treatment. Furthermore, Torres testified in her deposition that Cintrón and Navarro never denied her requests to leave early, start work later or be absent to take care of her mother:

A Well eh to tell me don't go no, eh she asked me "but it is necessary for you to leave? But you and your brothers can't help you?" Obviously she, she, she didn't know that the matter was that we were rotating all the time, we even felt somewhat frustrated because we were powerless, we could do nothing for her, we wanted at least that the last months of her life she be attended very well and it was at home. If it was in a hospital well we had to go to the hospital, but she questioned the severity of my mother's illness so that I could dedicate time to the job.
Q She never told you you can't go?
A No, she never said that. No, you can't go she never said that.
Q Ms. Lorelli Navarro never denied you a request to take care of your mother, right?

A No, She never told me you can't go, she never said it.
Docket No. 38, Exhibit 1c, page 189.

7. 42 U.S.C. § 12112(b)(4) provides that the term "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known benefits of an individual with whom the qualified individual is known to have a relationship or association." *Id.*

8. The EEOC Interpretive Guidance of 29 C.F.R. § 1630.8 describes situations which illustrate the scope and applicability of ADA's "association provision":

To illustrate the scope of this provision, assume that a qualified applicant without a disability applies for a job and discloses to the employer that his or her spouse has a disability. The employer thereupon declines to hire the applicant because the employer believes that the applicant would have to miss work or frequently leave work early in order to care for the spouse. Such a refusal to hire would be prohibited by this provision. Similarly, this provision would prohibit an employer from discharging an employee because the employee does volunteer work with people who have AIDS, and the employer fears that the employee may contract the disease.

This provision also applies to other benefits and privileges of employment. For example,

digmatic example of a 'relationship' under the association provision of the ADA." *Den Hartog*, 129 F.3d at 1082.

■ To establish a *prima facie* case of association discrimination under the ADA, a plaintiff must show that he: (1) was qualified for the job at the time of the adverse employment action; (2) was subjected to adverse employment action; (3) was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Sifre*, 38 F.Supp.2d at 100 (*citing Hartog*, 129 F.3d at 1085).

■ In the motion for summary judgment, Axesa claims that Torres was not entitled to reasonable accommodation to take care of her mother because the ADA does not provide a non-disabled employee with the right to reasonable accommodation to take care of said employee's disabled associate. Docket No. 33, pages 34–35. Torres, however, insists that the evidence "clearly" establishes a *prima facie* case of association discrimination. Docket No. 42, pages 12–16. After reviewing the allegations of both parties regarding this issue, the court determines that Axesa is correct in its position that the ADA does not require an employee to provide reasonable accommodation to a non-disabled employee in order for said employee to take care of a disabled associate.

In *Den Hartog*, the Court of Appeals for the Tenth Circuit held that, unlike a claim brought by a disabled person, an employer is not required to reasonably accommodate a non-disabled employee based on said employee's association with a disabled person:

Although no court has yet addressed the issue, it appears from the language and legislative history of the ADA, and also from the EEOC's "interpretive guidance" thereto, that the protection afforded to non-disabled employees who have an association with a disabled person differs in one significant respect from that afforded to disabled employees. This difference is the application of the ADA's "reasonable accommodation" requirements.

. . .

. . .

The ADA states that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual. . . ." 42 U.S.C. § 12112(a). In the context of this general prohibition, the word "discriminate" is a term of art which includes "not making reasonable accommodations." *See* 42 U.S.C. § 12112(b)(5) (1994); 29 C.F.R. § 1630.9(a) (1996). By the plain terms of § 12112(b)(5), however, the ADA does not require an employer to make any "reasonable accommodation" to the disabilities of relatives or associates of an employee who is not himself disabled.

Specifically, 42 U.S.C. § 12112(b)(5)(A) defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability *who is an applicant or employee,* . . . ." (emphasis added).[9] Further, 42

---

an employer that provides health insurance benefits to its employees for their dependents may not reduce the level of those benefits to an employee simply because that employee has a dependent with a disability. This is true even if the provision of such benefits would result in increased health insurance costs for the employer.

29 C.F.R. Pt. 1630, App. § 1630.8.

**9.** 42 U.S.C. § 12112(b)(5)(A) states in full that the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered

U.S.C. § 12112(b)(5)(B) defines "discriminate" to include "denying employment opportunities to *a job applicant or employee* who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments *of the employee or applicant.*" (emphasis added). Thus, the plain language of both these provisions-the only two provisions requiring "reasonable accommodation" in Title I of the ADA-suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated.

We are confident that the lack of any reference to the associates or relatives of the employee or applicant in Section 12112(b)(5)'s articulation of the ADA's "reasonable accommodation" requirement is not due to any inadvertent omission. In its Report, the House Education and Labor Committee clearly expressed its intention that under the association provision, "[t]he employer need not provide any accommodation to the nondisabled employee." H.R.Rep. No. 101–485, pt. 2, at 61–62 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 344. *See* Subpart A, *supra.*

*Den Hartog,* 129 F.3d at 1083–84 (emphasis in original).

Other courts which have interpreted the meaning and scope of ADA's association provision have likewise held that 42 U.S.C. § 12112(b)(5) does not mandate that an employer provide an employee without a disability with a reasonable accommodation to enable the employee to take care for a disabled individual with whom the employee is associated. *See e.g., Larimer v. International Business Machines Corp.,* 370 F.3d 698, 700 (7th Cir.2004), *cert. denied,* 543 U.S. 984, 125 S.Ct. 477, 160

L.Ed.2d 365 ("The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.") *Tyndall v. National Educ. Centers, Inc. of California,* 31 F.3d 209, 214 (4th Cir.1994) ("The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability.") *Kennedy v. Chubb Group of Ins. Companies,* 60 F.Supp.2d 384, 396 (D.N.J.1999); *Reddinger v. Hospital Central Services, Inc.,* 4 F.Supp.2d 405, 409 (E.D.Pa.1998); *Miller v. CBC Cos.,* 908 F.Supp. 1054, 1066 (D.N.H.1995). Furthermore, the EEOC's Interpretative Guidance confirms that the ADA does not require an employer to reasonably accommodate a non disabled employee so that the employee can take care of his disabled associate:

It should be noted, however, that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability.

29 C.F.R. Pt. 1630, App. § 1630.8.

In light of the above, the court determines that Torres' claims under the association provision of the ADA can not prosper. As stated before, Torres essentially claims that Axesa failed to provide her with a reasonable accommodation that would have allowed her to take care of her mother. The ADA, however, does not require Axesa to provide such accommodation. Consequently, summary judgment

entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* (footnote added).

shall be entered DISMISSING WITH PREJUDICE Torres' claims based on her association with a disabled individual.

## C. ADEA claims.

█ Torres also brings claims under ADEA alleging that she has been discriminated and retaliated against due to her age. ADEA makes it unlawful for an employer to discriminate against any individual with respect to his terms and conditions of employment or to adversely affect his status as an employee, because of such individual's age. *See* 29 U.S.C. § 623(a).[10] For a plaintiff to prove an ADEA cause of action, direct or indirect discriminatory evidence can be brought forth to prove that an adverse employment action occurred as a result of a discriminatory practice based on age. The trial court must evaluate the evidence presented as a whole in order to determine if such evidence, whether direct or indirect, is sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by a discriminatory animus based on age. *See Hidalgo v. Overseas Condado*, 120 F.3d 328, 335 (1st Cir.1997) (*citing LeBlanc v. Great American Ins. Co.*, 6 F.3d at 843).

█ In the absence of direct evidence, a plaintiff may prove discriminatory evidence through the well established *McDonnell Douglas* framework. The employee must initially come forward with sufficient evidence to establish a *prima facie* case of age discrimination. Thus, the employee must establish that: (1) he or she is within the protected age group; that is, over forty years of age; (2) that his or her job performance was satisfactory and met the employer's legitimate expectations; (3) that he or she suffered an adverse employment action (e.g., an actual or

constructive discharge); and (4) that defendant sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills. *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 68 (1st Cir.2002); *Pueblo Int'l*, 229 F.3d at 53; *Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1st Cir.1997); *Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir.1991). The required *prima facie* showing is not especially burdensome. *See Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995); *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994), *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 n. 4 (1st Cir.1994).

Establishing a *prima facie* case generates a rebuttable presumption of discrimination. While the burden of persuasion remains at all times with the plaintiff, the *prima facie* case shifts the burden of production to the employer, who must then articulate a legitimate non-discriminatory reason for the adverse employment action. *See Mesnick*, 950 F.2d at 823. "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Id.* (*citing Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9(emphasis added)). If the employer meets this limited burden, the presumption vanishes and the plaintiff must adduce sufficient evidence to demonstrate that age was a motivating factor in the challenged employment action. *Zapata–Matos v. Reckitt & Coleman, Inc.*, 277 F.3d 40, 45 (1st Cir.2002). To do so, plaintiff must show that the proffered reason is

---

**10.** This section provides that: "It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

pretextual such that discriminatory animus can be inferred. *Gonzalez*, 304 F.3d 63, 69 (1st Cir.2002). "It is not enough for a plaintiff to merely impugn the veracity of the employer's justification, [s]he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive, age discrimination.'" *Mesnick*, 950 F.2d at 824 (*quoting Medina–Munoz*, 896 F.2d at 9).

In requesting summary judgment as to Torres' claims under ADEA, Axesa concentrates on whether Torres complied with the third prong of the *prima facie* case, namely, whether she suffered an adverse employment action during the time she was a member of the protected class (over forty years of age). Axesa alleges that she did not.

█ In the case at bar, it is undisputed that when Torres resigned from Axesa, she was approximately 40 years and 3 months old. Docket No. 34, ¶ 50; Docket No. 42, SCUF, ¶ 1. For purposes of the ADEA claims, Torres was a member of the protected class for approximately three months only. Thus, in determining whether Torres has established a *prima face* case of age discrimination, the court must limit its inquiry to those acts occurring within those three months.[11] Any other previous discriminatory act is not within the scope of ADEA coverage. *See Rivera–Diaz v. Executive Airlines*, 413 F.Supp.2d 36, 41 (D.P.R.2006) ("The plaintiff will not be able to establish a prima facie case under the ADEA, because the uncontested facts show that the plaintiff was thirty-nine years old at the time she was terminated from Executive Airlines. Executive Airlines is therefore entitled to summary judgment on the plaintiff's ADEA claim."); *see also Bankston v.*

*Chertoff*, 460 F.Supp.2d 1074, 1088 (D.N.D. 2006) ("It is undisputed that Bankston was not at least forty years old at the time of his reassignment or his termination. Thus, the Court finds Bankston's claims of age discrimination fail as a matter of law.")

In support of her age discrimination claims, Torres argues that Frank Matías ("Matías"), a Major Account Representative working with Axesa, testified in his deposition that Cintrón held weekly meetings with him and Torres and told them that "we are going to leave our lives in this campaign" ("se nos iba la vida en la campaña"), meaning that they were going to be discharged, and that Torres and Matías were not performing as the other salesman because they were "old" and "sick". Docket No. 42, Exhibit No. 8 (Matías' depo., at pages 38–40, 52). In addition, Torres cites Matías' as acknowledging in his deposition that Cintrón told him that Axesa's "new owners" wanted to get rid of "older people" and wanted "new blood" ("sangre nueva"). Docket No. 42, Exhibit No. 8 (Matías' depo., at page 62).

Torres also claims that Cintrón would "constantly" tell her that she was "old and worthless and should leave". Docket No. 42, Exhibit 1, (Torres' Sworn Statement, ¶ 34). Finally, she asserts that immediately after her "voluntary resignation" on August 30, 2005, effective September 2, 2005, she was replaced by Braulio Delgado, who was approximately 30 years old. *Id.*, ¶ 79. It is not entirely clear from the evidence submitted by Torres whether these acts, if true, occurred before or after Torres turned forty years old (except for the factual allegation that Braulio Delgado was appointed to replace Torres which, if true, occurred after she turned forty). The court determines, however, that even if

11. Torres was born on May 14, 1965. Docket No. 34, ¶ 4; Docket No. 42, SCUF, ¶ 1. There-fore, she turned forty on May 14, 2005.

said acts occurred after Torres turned forty, Torres has failed to establish a *prima facie* case of age discrimination.

■ "[S]tray workplace remarks, as well as statements made either by non decision-makers or by decision-makers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." *Gonzalez*, 304 F.3d at 69 (*citing Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001)); *see also Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 96 (1st Cir.1996) ("Direct evidence of discrimination does not include stray remarks in the workplace, particularly those made by non decision-makers or statements made by decision makers unrelated to the decisional process itself."); *Thomas v. Sears Roebuck & Co.*, 144 F.3d 31, 34 (1st Cir.1998) ("Stray remarks are not enough to meet Plaintiff's burden in an ADEA case"); *Moreno Morales v. ICI Paints*, 383 F.Supp.2d 304, 316 (D.P.R. 2005) (ambiguous comments or stray remarks that do not necessarily refer to discriminatory animus are not probative of age discrimination); *Perez–Ortiz v. Supermercados Amigo, Inc.*, 964 F.Supp. 607, 609 (D.P.R.1997) (stray remarks accompanied by "vague, conclusory accusations of discrimination by unidentified younger employees making comments of unspecified content on indefinite occasions" cannot be used as direct evidence to prove age discrimination).

■ Temporal proximity between the remarks and the ensuing employment action speak to the reasonableness of an inference that a causal relationship existed between the remarks and the decision made. *Vesprini v. Shaw Contract Flooring Services, Inc.*, 315 F.3d 37, 41–42 (1st Cir.2002). Moreover, the comments must unambiguously evince an age-based animus, such that they are not reasonably susceptible to a benign connotation. *Id.; Gonzalez*, 304 F.3d at 70.

■ Cintrón's comments that Torres was "sick" and that Cintrón, Torres and Matías were going "to leave [their] lives in this campaign" are insufficient to support Torres' claims of age discrimination because these comments are not age related and therefore do not reflect a discriminatory animus based on age.[12] With regard to the comment that Torres was "old and worthless and should leave", although certainly insensitive, unprofessional and offensive, the same is nothing more than a stray remark insufficient to establish discriminatory animus. *See Colom–Gonzalez v. Black & Decker, PR, LLC.*, 193 F.Supp.2d 419, 422 (D.P.R.2002) ("old man", "grandfather" and "uncle" remarks made to plaintiff do not amount to direct evidence of age discrimination under ADEA because they were made two years before his termination and were "nothing more than stray remarks which fail to satisfy [plaintiff's] burden of production of direct evidence."); *Dominguez v. Eli Lilly and Co.*, 958 F.Supp. 721, 739 (D.P.R.1997) (comments that some employees were "very old and sick" and could no longer compete with more educated, youthful employee, was stray, isolated remark); *see also Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1026 (6th Cir.1993), *cert. denied*, 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135

---

**12.** Torres was granted until November 9, 2007, to file translations to certain exhibits that had been filed. Docket No. 45. Plaintiff has failed to comply with said order. Therefore, Exhibit 8 shall be stricken from the record for purposes of evaluating the motion for summary judgment. *See* Rule 10(d) of the Local Rules of the U.S. District Court for the District of Puerto Rico ("Local Rules"); *Lopez–Carrasquillo v. Rubianes*, 230 F.3d 409 (1st Cir.2000); *Rivera v. Hospital Interamericano de Medicina Avanzada*, 125 F.Supp.2d 11 (D.P.R.2000).

(1993) (factory manager's comments that plaintiff was too old to be a secretary and that her fifty-fifth birthday was a cause for concern were isolated, ambiguous remarks insufficient to support a finding of age discrimination); *Shenker v. Lockheed Sanders, Inc.*, 919 F.Supp. 55, 60–61 (D.Mass.1996) (supervisor's remarks that plaintiff could handle a layoff better than other employees because he was older and that management should not feel attached to older employees were insufficient to warrant a finding of age discrimination).[13]

 Furthermore, the comment that Axesa's "new owners" wanted "new blood" is also insufficient to support a claim of age discrimination under ADEA insofar they are not indicative of age discrimination. *See Arce v. ARAMARK Corp.*, 239 F.Supp.2d 153 (D.P.R.2003). In *Arce*, this court expressed the following:

> According to the plaintiffs, almost two years prior to Tirado's layoff Monteagudo, Managing Director for ARAMARK Services of Puerto Rico, Inc., referred to newly hired employees as "new blood"

that he wanted to inject into the Company. He also indicated that from them "we can learn." The Court finds these comments are not indicative of age discrimination. "Standard usage and common sense dictate that ... 'new blood' means change. Th[is] comment [ ], whether reviewed in the abstract or in the context of his case, simply cannot support a determination of age bias." *Fortier v. Ameritech Mobile Communications*, 161 F.3d 1106 (7th Cir.1998). *See also, EEOC v. Clay Printing Co.*, 955 F.2d 936 (4th Cir.1992) (the statement "young blood" is not probative of age discrimination or of a discriminatory animus); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) (the statement "younger blood" does not create a genuine issue of fact in age discrimination case). Also, it has been noted that "[w]ords of praise of youth ... do not, by themselves, indicate a bias against more mature workers." *Mesnick*, 950 F.2d at 825. *See also Shager v. Upjohn Co.*, 913 F.2d 398, 400–02 (7th Cir.1990) (superior's remark

---

13. Even taking as true Torres' claim that Cintrón would "constantly" tell her that she was "old and worthless and should leave", no evidence has been presented that the same—during the period of approximately three months that she was forty years old—left her with no real choice but to resign. *See also Suarez*, 229 F.3d at 56:

> In a last-ditch effort to turn the tide, the appellant urges us to assay his predicament in light of certain remarks about his age. To this end, he mentions that Keon told him that some of his proposals were "tired" and mused that another employee "looked old." He adds that Pérez stated in a press conference when he first arrived that Pueblo needed "new blood." These statements, the appellant tells us, poisoned the air and justified his decision not to resume his post.
>
> That contention calls for red meat and strong drink, but the appellant offers only the most bland proof to support it. We do not doubt that, under some circumstances, comments relating to an employee's age

can contribute to the creation of an intolerable work environment (and thus support a claim of constructive discharge). *See, e.g., Ramos*, 167 F.3d at 730–31. Here, however, the remarks attributed to Keon and Pérez are not only profoundly ambiguous, but also much too innocuous to transform routine managerial decisions into something more invidious. Although these comments may well have struck the appellant, subjectively, as mean-spirited and hurtful, a reasonable employee in his position would not have treated them as leaving him no real choice but to resign. *See Calhoun*, 798 F.2d at 561 (explaining that employees may not be unreasonably sensitive to their working environment).

*Suarez*, 229 F.3d at 56 (internal footnote omitted). Since Torres was not demoted or fired and her salary was never reduced, it is difficult to envision what adverse employment action she has suffered based on age discrimination.

that "[i]t was refreshing to work with a young man with . . . a wonderful outlook on life and on his job" not probative of age discrimination); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990) (the court granted summary judgment for employer despite comment that plaintiff's replacement was "a bright, intelligent, knowledgeable young man.").

*Arce,* 239 F.Supp.2d at 161.

■ Finally, as to the fact that upon Torres' "voluntary resignation", she was replaced by Braulio Delgado, who was approximately 30 years old, the court notes that the mere fact of replacement by a younger employee is not dispositive of age discrimination. *See La Montagne v. Amer. Convenience Prod., Inc.,* 750 F.2d 1405, 1413 (7th Cir.1984) (It is not violation of ADEA to replace an employee in a particular class with younger person as long as the protected employee is not replaced because of his age. "Because younger people often succeed to the jobs of older people for perfectly legitimate reasons, the mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination."); *see also Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 512 (4th Cir.1994); *Chappell v. GTE Products Corp.,* 803 F.2d 261, 267 (6th Cir.1986) ("The isolated fact that a younger person eventually replaces an older person is not enough to permit an inference that the replacement was motivated by age discrimination."); *Turner v. North American Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir.1992). Therefore, the fact that Braulio Delgado replaced Torres, by itself, is also insufficient to support Torres' claim of age discrimination against Axesa.

■ In conclusion, Torres has failed to state a *prima facie* case of age discrimination under ADEA. Torres only brings evidence of a few, specific age-related incidents which are either stray remarks or insufficient to allow an inference that they were motivated by a discriminatory animus based on Torres' age. Moreover, Torres has failed to provide enough evidence for a rational fact finder to conclude that she suffered an adverse employment action as a result of discrimination based on age. Thus, Torres claims under ADEA are hereby DISMISSED WITH PREJUDICE and summary judgment shall be entered accordingly.[14]

### D. Retaliation claims.

Torres also claims that she was subjected to retaliation after she complained of the alleged age and disability discrimination she was enduring and after she requested reasonable accommodation to take care of her cancer condition as well as to take care of her mother. Torres brings her retaliation claims pursuant to ADA and ADEA.

ADEA prohibits an employer from discriminating "against any of his employees . . ., because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). Similarly, ADA forbids discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

---

14. This conclusion makes it unnecessary to entertain an analysis of the remaining factors of the prima facie case of age discrimination.

■ Generally, the basis of a retaliation *prima facie* case under ADA and ADEA is that the plaintiff engaged in conduct protected by the Constitution or by statute, that the defendant took an adverse action against the plaintiff, and that this adverse action was taken (at least in part) because of the protected conduct.[15] *Sifre*, 38 F.Supp.2d at 101; *Vizcarrondo v. Board of Trustees of University of Puerto Rico*, 139 F.Supp.2d 198, 204 (D.P.R.2001). The plaintiff always bears the burden of establishing *prima facie* case based on the aforesaid elements. *Id., citing Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996).

Torres claims that she meets the first prong of the *prima facie* case because she engaged in a protected activity when she requested reasonable accommodation and when she complained to Cintrón and Navarro that she was being discriminated due to her age, her disability and her association with a disabled individual.

■ An ADA plaintiff need not prevail on a disability claim to assert a claim for retaliation. *Wright v. CompUSA*, 352 F.3d 472, 477 (1st Cir.2003), *citing Soileau*, 105 F.3d at 16; *Mesnick*, 950 F.2d at 827; *Siaca v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 160 F.Supp.2d 188, 198 (D.P.R.2001). Furthermore, requesting reasonable accommodations and presenting an informal complaint to management are protected activities for the purposes of the ADA retaliation provision. *Wright*, 352 F.3d at 478; *Sifre*, 38 F.Supp.2d at 102.

■ As to ADEA, it is of no consequence to his retaliation claims that a plaintiff fails to present a claim of discrimination under said statute. *See Mesnick*, 950 F.2d at 827 (holding that a plaintiff who fails to establish a claim of discrimination may still assert a retaliation claim under the ADA and ADEA); *Soileau*, 105 F.3d at 16.

Torres states in her sworn statement that, beginning on November, 2004, and up to her resignation, she complained on several occasions to Navarro, Báez and Cintrón that she was being harassed and discriminated against because of her age, disability and her association with a disabled individual, and that she needed reasonable accommodation to take care of her cancer condition and her mother. *See* Docket No. 42, Exhibit 1 (Torres' Sworn Statement, ¶¶ 45–47, 50, 52–54, 74). These activities are protected under the ADA and ADEA. Thus, the court determines that Torres meets the first prong of the *prima facie* retaliation case.

As to the second and third prongs of the *prima facie* case of retaliation, Torres essentially claims that after she requested reasonable accommodation and complained to Cintrón and Navarro that she was being discriminated due to her age, her disability and her association with a disabled individual, she suffered such intolerable working conditions that she was left with no other option but to resign. Thus, Torres essentially presents a claim of constructive discharge based on said alleged retaliatory actions.

■ "The ADA supports a claim of constructive discharge." *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 667 (D.P.R.1997). Similarly, "a constructive discharge can constitute an adverse

---

**15.** The First Circuit has analogized the ADA and ADEA to the Title VII context, "in requiring a plaintiff that is bringing a claim of retaliation to show: (1) that he or she was engaged in protected conduct; (2) that he or she was discharged; and (3) that there was a casual connection between the discharge and the conduct." *Sifre*, 38 F.Supp.2d at 102. *See Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997).

employment action under the ADEA." *Jorge v. Rumsfeld*, 404 F.3d 556, 562 (1st Cir.2005); *see also Suarez*, 229 F.3d at 54 (a constructive discharge can ground a claim under the ADEA).

 " 'Constructive discharge' is a label for "treatment so hostile or degrading that no reasonable employee would tolerate continuing in the position." " *Melendez–Arroyo v. Cutler–Hammer de P.R. Co.*, 273 F.3d 30, 36 (1st Cir.2001), *citing Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir.1997). The standard is an objective one: the conditions must be so difficult or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign. *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir.2002); *citing Suarez*, 229 F.3d at 54. Properly applied, this standard "does not guarantee a workplace free of the usual ebb and flow of power relations and inter-office politics." *Suarez*, 229 F.3d at 54. Rather, the plaintiff must establish that "working conditions were so unpleasant that staying on the job while seeking redress would have been intolerable." *Marrero*, 304 F.3d at 28 (*quoting Keeler v. Putnam Fid. Trust Co.*, 238 F.3d 5, 10 (1st Cir.2001) (internal quotations omitted)).

 A constructive discharge can arise from, among other things, "reassignment with significantly diminished job responsibilities, or a decision causing a significant change in benefits." *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, a reduction in responsibility that is not accompanied by a diminution in salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge. *See Suarez*, 229 F.3d at 55.

Most of the retaliatory actions alleged by Torres are general and conclusory allegations that are insufficient to justify her claims that she was constructively discharged. Some of the alleged actions are also contradicted by the uncontested facts of the case at bar.

With regard to the ADA and ADEA retaliation claims, Torres alleges that as a result of her reasonable accommodation requests and age discrimination complaints, her supervisors at Axesa retaliated against her creating such an environment that she had no option but to resign. In particular, Torres claims that upon her complaints that she was being denied reasonable accommodation and discriminated against because of her age, Cintrón took away some of her top performing clients, stopped inviting her to sales meetings, issued negative performance evaluations and constantly made discriminatory remarks telling her that she was going to be discharged because of her complaints. The court will address each of the claims separately.

**1. Claims that Cintrón took away from plaintiff top performing clients in retaliation for her reasonable accommodation requests and age discrimination complaints.**

 This particular claim fails to support a claim of retaliation in light of the uncontested facts of the case at bar. In this case, it is uncontested that the only time Torres' clients were re-assigned was from late March to mid-April 2005. Such brief reassignment was made because Torres was on short term disability leave during that period of time. Docket No. 34, Exhibit 10, ¶ 8.[16] Furthermore, it is also

---

**16.** Torres does not deny the fact that said reassignments only lasted from March to mid-April, 2005, despite the fact that she testified in her deposition that the accounts were taken away from her on November or December,

uncontested that Torres can not even remember which clients assigned to her were allegedly taken away from her in November and December 2004, and to which sales representatives were they allegedly reassigned. Docket No. 38, Exhibit 1c, pages 201–02.[17]

### 2. Claims that Cintrón stopped inviting plaintiff to different sales meetings as a result of reasonable accommodation request and age discrimination complaints.

As to these sales meetings, Axesa alleges that Torres knew that her team had weekly meetings with Cintrón on Monday mornings. The purpose of these weekly meetings was to discuss any situation that had arisen in or outside the office or to update Cintrón as to the status of sales. Docket No. 34, ¶ 35. Axesa also alleges that Torres questioned Cintrón about why she was not notified of one meeting, and that Cintrón replied that she was unable to reach Torres on the phone. Docket No. 34, ¶ 37. Torres claims that notwithstanding the fact that Cintrón failed to inform her about the sales meetings that were held on Monday mornings, she attended said meetings. However, she

---

2004. *See* Docket No. 38, Exhibit 1c, pages 101–102.

**17.** In her deposition, Torres testified the following:

Q You allege that more important functions and responsibilities were taken away from you and they were assigned to employees that were younger and with less experience.

A Yes eh …

Q What are you referring to with that?

A … accounts.

Q Accounts.

A They took accounts away from me.

Q Okay, they took accounts away.

A Yes.

Q What accounts did they take away?

A They took away accounts eh that …

Q What accounts specifically?

A I don't remember, I don't remember. That was, it was at the beginning of my entire situation.

Q At the beginning you are referring to when?

A Eh of my illness.

Q In November of 2004?

A November, December eh they took away accounts. Eh these accounts could mean for me more commission because eh well I needed to earn more money obviously with my entire situation, but these accounts were worked by other salespersons.

Q So, you stopped working these accounts in December of 2004.

A Yes it could have been. I know it was at the beginning of this entire situation.

Q And this situation began at the end of November 2004.

A Yes at the end of November it could have been. Yes.

Q And who, when you say other salespersons, whom are you referring to?

A Eh I don't remember which were the salespersons, it could be eh … I don't remember, I don't remember the salesperson to whom they were assigned.

Docket No. 38, Exhibit 1c, pages 201–02.

However, in her *post-deposition, post-summary* judgment Sworn Statement, Torres states the following:

Cintrón also took away from me my most important clients, and my top income producing clients, and assigned the same to the other two salesmen. However, Cintrón did not modify nor reduced my sales quotas, notwithstanding the fact that she took away from me my top income producing clients, among these, the following: Alberto O. Lozada Colón, Funeraria Hernández Rivera, X–Ray Diagnostic Center, Worldnet Telecommunications, Inc. HIMA, Caguas; HIMA, Humacao.

Docket No. 42, Exhibit 1 (Torres' Sworn Statement, ¶ 41). Torres' statement is inconsistent with her prior testimony during her deposition. Torres was specifically asked which clients were allegedly taken away from her and to whom they were assigned, and she repeatedly answered that she could not remember. No reasonable explanation has been provided by Torres for such inconsistency. Thus, paragraph 41 of Torres's Sworn Statement shall be stricken from the record. *See Hernandez–Loring v. Universidad Metropolitana,* 233 F.3d 49, 54 (1st Cir.2000).

also claims that Cintrón held other weekly sales meetings with the other salesmen, but that Cintrón did not invite her to those meetings. Docket No. 42, ¶¶ 55–56. Even if Torres' allegations are true, Torres fails to allege how her absence to or exclusion from those meetings affected the terms and conditions of her employment in such a manner that she was forced to resign.

### 3. Claims that Cintrón rated plaintiff's performance negatively as a result of her claims for reasonable accommodation and age discrimination complaints.

As to these claims, Axesa alleges that on August 15, 2005, Torres met with Cintrón and Navarro to discuss a Disciplinary Document and Memorandum ("Memorandum") given to Torres regarding the results of the Isla 2005 Sales Canvass. Among the issues addressed in the Memorandum was the discrepancy between the projections reported by Torres on June 27, 2005 and the final results. (Exhibit 6). In particular, the Memorandum indicated that:

(1) said discrepancy was unacceptable because it directly affected the forecasts provided to Axesa's management and also did not permit said company to make timely efforts to recover the lost profit;

(2) that Torres' performance during the Isla 2005 sales canvass was unacceptable because it reflected the following: negative net sales; $0 in new sales; only 32.9% of the sales objective was accomplished in the Infovoz product; only 59% of the sales objective was accomplished for the Superpages product was reached; only 7.1% increase in accounts, versus the objective of 10.5%; and 15.1% of reported decreases and losses in sales, versus the objective of 9.7%;

(3) an action plan was adopted for Torres in order to address specific areas of improvement including: preparation of accounts, participation in the program to target advertising agencies, minimizing reductions and cancellations, increasing new sales, increasing productivity and continuing to improve communication; and

(4) that Cintrón would meet with Torres at the end of the "USVI" and "Guía Móvil" sales campaign to review the results of that campaign. Docket No. 38, Exhibit 6.

Torres, however, signed the Memorandum and specifically told Cintrón that there was "no problem" and that "[i]f the attitude is of going forward, if the attitude is to respond to the company, I am going to respond." Docket No. 38, Exhibit 1c, pages 147–48. Moreover, Navarro specifically wrote in the "Commitment" section of the Disciplinary Document that Torres demonstrated that she was "receptive and committed" to improving her performance. Docket No. 38, Exhibit 1c, at 147–48; Exhibit 6.

Torres claims that on numerous occasions before the Memorandum was issued, she informed Cintrón and Navarro that the sales forecasts prepared by her had to be modified, since she had been unable to work her full working shift due to her illness, the treatment that she was receiving, and the fact that she had to take care of her mother. Docket No. 42, Exhibit 1 (Torres' Sworn Statement, ¶ 61). In addition, Torres also states that she informed Cintrón and Navarro that her sales numbers were lower because her most important clients were taken away from her, while at the same time, neither her sales quotas nor the sales forecasts were modified. *Id.* According to Torres, Cintrón and Navarro informed her that the sales forecasts were not going to be modified or reviewed, and that she either she fully complied with and met her sales quotas or else she would be discharged. *Id.,* ¶ 62. Torres also alleges that she informed Cintrón and Navarro that their actions of

negatively evaluating her performance based on those factors and their failure to provide her with reasonable accommodations, notwithstanding her numerous requests, were discriminatory. *Id.,* ¶ 66. Furthermore, she states that Cintrón and Navarro informed Torres that neither of them would take any action whatsoever nor change anything from the warning that was given to her, that she was being placed on a probationary period and that her performance would be further evaluated at the end of the "USVI" and "Guía Móvil" sales campaign. *Id.,* ¶ 69.

. These allegations also fail to sustain a claim of retaliation. As to the placing of Torres on probation status because she failed to meet her sales quota, it is uncontested that, as matter of fact, when Torres returned from her short term disability leave, her sales quota was adjusted in order to take into consideration the time she was on short term disability. Docket No. 38, Exhibit 1a, page 90; Exhibit 10, ¶ 6. Furthermore, despite plaintiff's allegations of claims that she made to Cintrón and Navarro prior to the Memorandum, plaintiff admitted during her deposition that when she was confronted with said Memorandum she acknowledged that there was "no problem". Docket No. 38, Exhibit 1c, pages 147–48.

**4. Claims that Cintrón started to constantly make discriminatory comments against plaintiff because of her age, her requests for a reasonable accommodation and because she had taken time off in order to receive treatment for her breast cancer condition and take care of her mother.**

 It is uncontested that neither Cintrón nor Navarro made any negative comments to Torres regarding the time she took to go to medical appointments or receive radiotherapy treatment. Docket No. 38, Exhibit 1a, pages 43–44, 88, 89.

Furthermore, Torres testified in her deposition that Báez, Navarro and another employee by the name of Jackie Tabert told her that she could take all the time she needed to take care of her breast cancer condition:

Q And why did you bring your diagnosis to the attention of, of, of … ?

A To Jackie Tabert?

Q Well to all these persons in Axesa …

A Well I understood, I have always been a very structured person and I understood that the persons directly from sales had to know what was happening to me because one way or another the functions were going to be affected somehow with time, right? And then, eh, well Jackie Tabert obviously because of her position and Human Resources because it was their duty, their duty, no, it's not duty, it was … well they were directly involved in the news.

Q And you asked that they not disclose your condition to anybody.

A Exactly.

Q But you indicated you would continue working.

A Yes, yes, that I was going to do everything possible to continue to fulfill all of my functions, all of my duties and all of the requirements that the company was requesting at that time.

Q And they indicated to you that you could take all the time that you needed, right?

A Yes, they said "eh, let us know, eh, what is the next thing that will occur, eh, and let Mrs. Lorelli Navarro know directly", that she was the Sales Manager at that time, eh, about the operation and everything that is occurring.

Q They told you that if you needed time well, of course, that you could take the time.

A Yes, yes.

Docket No. 38, Exhibit 1a, pages 61–62. In addition, even if Cintrón made such comments in relation to plaintiff's taking time off, said comments do not constitute adverse employment actions by themselves. "Negative comments, even comments relating to an individual's claimed disabilities, are not, standing alone, adverse employment actions, because mere comments do not materially affect employment." *Teachout v. New York City Dept. of Educ.*, No. 04–945, 2006 WL 452022, at *13 (S.D.N.Y. Feb.22, 2006) (*citing Brennan v. City of White Plains*, 67 F.Supp.2d 362, 374 (S.D.N.Y.1999) (Title VII case)).

■ However, in the sworn statement and the SCUF, Torres also claims that "Cintrón would continue with her daily retaliatory comments against me, specifically that I was going to be discharged because of my complaints." Docket No. 42, ¶ 77; Exhibit 1 (Torres' Sworn Statement, ¶ 55). Axesa denies this statement and requests that it be stricken from the record because "it is based on Torres' own conclusory, unspecific and self serving testimony". Furthermore, Axesa asserts that "during her deposition, [Torres] failed to make any reference to these comments by Cintrón." Docket No. 54, ¶ 77. Axesa, however, does not support its allegation that Torres never mentioned these comments in her deposition with a specific citation to the record. *See* Local Rule 56(d). In particular, Axesa does not point to any portion of Torres' deposition in

which she was specifically asked whether someone had made such comments to her. Indulging all reasonable inferences in favor of the party opposing the motion for summary judgment and taking into account that this allegation has not been adequately addressed by Axesa, the court hereby DENIES Axesa's motion for summary judgment as to Torres' retaliation claim under the ADA and ADEA.

### E. Supplemental jurisdiction claims.

Torres invokes this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for her claims arising under Puerto Rico's Law 80, Law 44 and Law 100.[18]

#### 1. Law 80.

■ Law 80 is Puerto Rico's Wrongful Dismissal Act. The only remedy it provides to an employee who is discharged without just cause is entitlement to receive severance payment from his/her employer. P.R. Laws Ann. tit. 29 § 185a. This payment consists of: (1) the salary the employee may have earned; (2) the salary corresponding to one month, as indemnity, if the employee was discharged within the first five years of service; the salary corresponding to two months if the employee was discharged after five years and up to fifteen years of service; and the salary corresponding to three months if the discharge was after fifteen years of service; and (3) an additional progressive compensation equal to one week for each year of service. *Id.*

According to Law 80, a dismissal without just cause is "[one] made by mere

---

18. Although the complaint does not contain a cause of action for damages under Article 1802 of the P.R. Civil Code, P.R. Laws Ann., tit. 31, § 5141, Torres requests "damages in an amount of not less than $650,000.00" for the alleged "mental anguish, mental and emotional sufferings and distress" and "compensatory damages caused as a result of the ille-

gal acts in an amount not less than $650,000.00", in addition to "punitive damages and double damages". Docket No. 1, § X, ¶¶ 3–5. In light of the absence of any such cause of action alleged in the complaint, summary judgment is also GRANTED as to any request for relief under Article 1802.

whim or fancy of the employer or without cause relative to the normal operation of the establishment." P.R. Laws Ann. tit. 29, § 185b. Law 80 allows the termination of an employee for a number of reasons which said statute defines as "just cause":

Just cause for the termination of an employee shall be understood to be:

(a) That the worker indulges in a pattern of improper or disorderly conduct.

(b) The attitude of the employee of not performing his work in an efficient manner; or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment.

(c) The employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee.

(d) Full, temporary or partial closing of the operations of the establishment.

(e) Technological or reorganization changes as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public.

(f) Reductions in employment made necessary by a reduction in the anticipated or prevailing volume of production, sales or profits at the time of the discharge.

P.R. Laws Ann. tit. 29, § 185b. Under Law 80, an employee bears the initial burden of alleging unjustified dismissal and proving actual dismissal. If the employee meets this burden, "the employer must establish by a preponderance of the evidence that the discharge was made for good cause." *See Hoyos v. Telecorp Communications,* 405 F.Supp.2d 199, 205–06 (D.P.R.2005).

Law 80 contains a retaliation component insofar it provides that an employee's "collaboration or expressions ... pertaining to his/her employer's business before any administrative, judicial or legislative forum in Puerto Rico when said expressions are not of a defamatory character nor constitute disclosure of privileged information according to law" does not constitute just cause for discharging said employee. P.R. Laws Ann. tit. 29, § 185b.

This provision refers to the discharge of an employee. Even though Torres was not discharged from her employment, Law 80 applies the same to her claim that she was constructively discharged. In *Arthur Young & Co. v. Vega III,* 136 D.P.R. 157 (1994), the Supreme Court of Puerto Rico held that Law 80 also allows claims of implicit or constructive discharge:

The Act defines the term discharge not only as the employee's express layoff but also as his implicit discharge. Insofar as it is pertinent, sec. 5 provides:

For purposes of this act, discharge shall be understood to be ... the resignation of the employee caused by the actions of the employer directed to induce or compel him to resign, such as imposing or trying to impose on him more onerous working conditions, reducing his salary, lowering his category or submitting him to derogatory criticisms or humiliations by deed or word. 29 L.P.R.A. § 185e.

In *Vélez Reilova v. R.Palmer Bros., Inc.,* 94 P.R.R at 169, we held that in order for an employer's voluntary and unjustified acts to be deemed an implicit discharge under Act No. 80, the employee must prove that the only reasonable alternative he had left was to give up his job.

*Arthur Young,* 136 D.P.R. at 183. Thus, the retaliation component of Law 80 may also apply to claims of constructive discharge.

In the case at bar, however, the retaliation component of Law 80 does not

apply to Torres' claim of constructive discharge. Even if it is true that Torres complained of age and disability discrimination and requested reasonable accommodations, said complaints and requests were made to Torres' supervisors. Torres has neither alleged nor presented evidence that said complaints were also made during the course of an "administrative, judicial or legislative forum in Puerto Rico" as required by the text of the statute. Therefore, Torres' claims of retaliation under Law 80 fall outside the scope of the retaliation provision of Law 80, are hereby DISMISSED WITH PREJUDICE, and summary judgment shall be entered accordingly.

### 2. Law 44.

■ Law 44 bans discrimination against the disabled by any public or private institution that receives funds from the Commonwealth of Puerto Rico. Specifically, Law 44 provides that said institutions may not take any action to "discriminate against persons with some type of physical or mental disability." P.R. Laws Ann., tit. 1, § 504. Law 44 was modeled after the ADA. Law 44 was intended to harmonize Puerto Rico law with the federal statutory provisions of the ADA. *Arce*, 239 F.Supp.2d at 169. Thus, the elements of proof for a claim under Law 44 are essentially the same as for a claim under

the ADA. *Zayas v. Commonwealth of Puerto Rico*, 378 F.Supp.2d 13, 23–24 (D.P.R.2005); *see also, Roman–Martinez v. Delta Maint. Serv., Inc.*, 229 F.Supp.2d 79, 85 (D.P.R.2002).[19]

Having found that Torres has no valid claim under ADA, the court determines that Torres' claims under Law 44 should suffer the same fate as her ADA claims. Accordingly, the request for summary judgment against Torres' claims under Puerto Rico Law 44 is hereby GRANTED. *See Zayas*, 378 F.Supp.2d at 24.

### 3. Law 100.

Law 100, Puerto Rico's general employment discrimination statute, seeks to prevent discrimination in employment by reason of age, race, color, religion, sex, social or national origin or social condition. P.R. Laws Ann., tit 29, § 146.[20]

■ Law 100 is the Puerto Rico equivalent of the ADEA, but the two statutes differ on the burden of proof required to show discrimination. *See Cardona–Jimenez v. Bancomerico de Puerto Rico*, 174 F.3d 36, 42 (1st Cir.1999); *see also Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 27 (1st Cir.1998). The principal difference between the ADEA and Law 100 is the burdens of proof imposed on the employer and employee. *See Cardona–Jimenez*, 174

---

**19.** A review of the text of the statute reveals that Law 44 lacks a retaliation component. *See* P.R. Laws Ann., tit. 1, § 502.

**20.** This section provides that:

Any employer who discharges, lays off or discriminates against an employee regarding his/her salary, wage, pay or remuneration, terms, rank conditions, or privileges of his/her work, or who fails or refuses to hire or rehire a person, or who limits or classifies his/her employment opportunities, or that affects his/her status as employee because of his /her age, ..., race, color, sex, social or national origin, social condition, political affiliation or politi-

cal or religious ideology of the employee or applicant for employment ... shall incur civil liability ... and ... shall also incur in a misdemeanor ... P.R. Laws Ann., tit. 29, § 146. The term "employer" is defined as including "any natural or [juridical] person employing laborers, workers or employees, and the chief, official, manager, officer, managing partner, administrator, superintendent, foreman, overseer, agent or representative of such natural or artificial person. It shall include all such agencies or instrumentalities of the Government of Puerto Rico as may be operating as private businesses or enterprises." *Id.*, § 151(2).

F.3d at 42. Law 100 establishes a rebuttable presumption that the employer has engaged in unlawful discrimination unless the employer can show that it had good cause to discharge the employee. P.R. Laws Ann. tit. 29 § 148. Once a plaintiff has alleged an unjustified dismissal and proves by a preponderance of the evidence that he was actually or constructively discharged, the burden then shifts to the employer to prove by a preponderance of the evidence that it had just cause to dismiss the employee. *Id.,; see also Cardona–Jimenez,* 174 F.3d at 42. To determine what constitutes good cause in a Law 100 claim, a court looks to the definition of good cause in Law 80. *Baez–Garcia v. Cooper Laboratories, Inc.,* 120 D.P.R. 145, 155 (1987). If the employer fails to show just cause, the Law 100 presumption of discrimination is triggered, and the burden of production and persuasion shifts from the employee, and the employer must prove by a preponderance of the evidence that the otherwise unjustified dismissal was not motivated by discriminatory animus. *Álvarez–Fonseca,* 152 F.3d at 28.[21]

■ As to the merits of the claims asserted under Law 100 and ADEA, the First Circuit has stated the following: "We need not wax longiloquent. On the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous." *Davila v. Corporacion De Puerto Rico Para La Difusion Publica,* 498 F.3d 9, 18 (1st Cir.2007); *Gonzalez,* 304 F.3d at 73 (same).

Having found that Torres has no valid claim under ADEA, the court likewise determines that Torres' claims under Law 100 can not prosper. Accordingly, the request for summary judgment against Torres' claims under Puerto Rico Law 100 is hereby GRANTED.

21. Another difference between ADEA and Law 100 is that Law 100 lacks a retaliation component. P.R. Laws Ann., tit. 29, § 146;

## V. Conclusion

In view of the foregoing, Axesa's motion for summary judgment (Docket Nos. 33–34) is hereby GRANTED IN PART AND DENIED IN PART. In particular, Axesa's motion for summary judgment is GRANTED as to Torres' discrimination claims under ADA, ADEA, Title VII, and state law claims pursuant to Law 80, Law 44 and Law 100. However, the request for summary judgment as to the retaliation claims under ADEA and ADA is DENIED.

IT IS SO ORDERED.

*see also Acevedo–Martinez v. Coatings Inc. and Co.,* 286 F.Supp.2d 107, 117 (D.P.R.2003).